**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BUILDERS SUPPLY CO. OF HOUSTON, Respondent.**

**No. 26678.**

United States Court of Appeals
Fifth Circuit.

May 5, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Clifford Potter, Houston, Tex., David C. Nevins, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Richard S. Rodin, Atty., N.L.R.B., for petitioner.

Richard A. Royds, Carlton Wilde, Houston, Tex., Bracewell & Patterson, Houston, Tex., for respondent.

Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

This is a proceeding to enforce an order of the National Labor Relations Board finding the respondent, Builders Supply Company of Houston, Texas, in violation of § 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by interfering with, coercing, and restraining its employees in the exercise of their § 7 rights during a union organizational campaign in 1966. The Board found further that the respondent illegally discharged an employee, Robert Hayes, in violation of §§ 8(a) (3) and (1).

From 1955 until the early part of 1966, the non-supervisory production and maintenance employees at Builders Supply Company's three plants were represented for collective bargaining purposes by the Independent Concrete Workers' Union (hereinafter referred to as Independent).

In 1966, the General Drivers, Warehousemen and Helpers Union, Local 968 (hereinafter referred to as Teamsters) began an organizational drive among the employees and subsequently filed a petition for representation. Independent intervened, and on May 16, all parties met and stipulated for a consent election to be held June 17. The Teamsters prevailed in the election by a small margin, but, for reasons not pertinent to this decision, the election was set aside.

The unfair labor practices charged against the respondent occurred during the course of and following the election campaign.

I

*The Section 8(a) (1) Violations*

Throughout the campaign, the Board found, the respondent engaged in conduct which made it impossible for the employees to exercise a free choice in the election. In February, 1966, the respondent's general superintendent, Julian Gilbreath, inquired of Independent's president, Roy Carrico, if he knew of any employee who was signing Teamsters authorization cards. When Carrico replied that he did not know of anyone, he was asked by Gilbreath to "find out" and "let me know".

On the afternoon of May 16, the day the parties filed a stipulation for a consent election, several company officials met with Independent's officers to discuss the election. The company offered to assist Independent during the campaign and discussed the possibility of the company's president, Roy Drennan, making speeches on behalf of Independent.

One week before the election, Drennan telephoned Carrico to inquire how Independent's campaign was proceeding. After Carrico told him that he would make no attempt to influence fellow employees in the election, Drennan stated that *he* would try to influence anyone he could and announced that he had made a speech to the employees at one plant and was planning speeches for the other two plants.

Before the conclusion of the campaign, Drennan did in fact make speeches at all of the respondent's plants, seeking support for Independent. The trial ex-

aminer, however, found these speeches to be within the permissible bounds of § 8(c), and free from threats, reprisals, or promises of benefit.

Two days prior to the election, Drennan again conferred with Carrico by telephone, seeking the names of the persons who would act as observers for both unions at the election. The information was purportedly needed by the company for work scheduling purposes. Carrico said that he had no knowledge of the identity of the Teamsters observers, but, at Drennan's request, agreed to find out. He told Drennan that Independent's observers were himself, Vice-President (of Independent) Smith, and Robert Hayes, a shop steward at the Chimney Rock plant. Drennan agreed that he had "a good one" in Smith, but in response to the information that Hayes would be an observer, said, "This Robert Hayes—he's a good Teamster. I guess you know he gave the Teamsters a barbeque the other night. I guess there's no use telling you —you were probably there". He suggested that Carrico use another observer at Chimney Rock, and Carrico agreed. Carrico eventually chose an observer other than the one suggested by Drennan, but did submit his name to Drennan.

Finally, near the end of the campaign, one of the respondent's foremen, Mac Warman, spoke to the employees at the McKees Street plant, urging them to vote against the Teamsters. He told one employee that he (Warman) "needed the Teamsters worse than he needed a snake" and between the two, would "choose the snake first". Warman asked another employee what he thought of the election and was told the employee was "where the money is". In reply to that Warman said, "so you're a Teamster—eh?" and walked off. He commented to a third employee, "You know the Teamsters give a lot of promises and that's all you get". He repeated this statement to still another employee and added that the Teamsters would do nothing for the employees and were not equipped to cope with problems in the cement industry.

This pre-election campaign was unique in at least one respect: We have here an employer who is much more concerned over the success of a particular union than are the officers of that union. In fact, the campaign waged by Independent's officers could be described as lackadaisical at the best. Although the Board found, and correctly so, that the respondent's active support of Independent was not in itself violative of the Act, this, as well as Drennan's pro-Independent speeches, may properly be considered "background" against which to examine those statements and conduct which were in fact found to be unlawful. See Hendrix Mfg. Co. v. N.L.R.B., 5 Cir., 1964, 321 F.2d 100.

The issue as to a violation of § 8(a) (1) is extremely close. Much of the alleged coercion and interference is comparatively mild when viewed in the light of the hard-core conduct which so often accompanies a representation campaign. Certainly, if we isolate each incident and examine it separately, there is little to suggest any unlawful activity on the part of the respondent. But viewing these incidents collectively, as we must, and recognizing that they occurred during the midst of an active campaign against representation by the Teamsters, we are constrained to hold that they amounted "at the very least to an uncoordinated pattern of coercion", N.L.R.B. v. West Point Mfg. Co., 5 Cir., 1957, 245 F.2d 783, 786.

Superintendent Gilbreath's effort to elicit information from Independent's president, concerning the identity of those who signed Teamster authorization cards, could reasonably be construed as an attempt to induce one employee to inform on others, an act we have expressly forbidden, Brewton Fashions, Inc. v. N.L.R.B., 5 Cir., 1966, 361 F.2d 8.

In addition, Foreman Warman's questioning of the respondent's employees at the McKees Street plant, in which he inquired about their union sympathies and made derogatory remarks about the Teamsters, contained elements of intim-

idation. This is one of those frequent situations wherein

"[T]he Board could properly find that this interrogation was coercive since it took place in an atmosphere of active opposition to the union, Bourne v. N.L.R.B., 332 F.2d 47, 48 (2d Cir., 1964), without explanation to the employees of the purpose of the questioning and under circumstances indicating that it had no legitimate purpose, Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754, 758–759 (2d Cir., 1963), and was unaccompanied by any assurances against reprisals, see N.L.R.B. v. Lorben Corp., 345 F.2d 346, 348 (2d Cir., 1965)."

Bryant Chucking Grinder Co. v. N.L.R.B., 2 Cir., 1967, 389 F.2d 565, 567; see, also, Martin Sprocket and Gear Co. v. N.L.R.B., 5 Cir., 1964, 329 F.2d 417.

The Board could likewise conclude that by President Drennan's insistence that Independent replace Hayes as an election observer, the respondent unlawfully interfered with that union's right to make a free and unhindered choice in selection of its representative. Cf. N.L.R.B. v. Roscoe Skipper, Inc., 5 Cir., 1954, 213 F.2d 793.

■ Consequently, we hold that there was substantial evidence on the record as a whole to support the Board's finding of a § 8(a) (1) violation.

## II

### The Discharge of Robert Hayes

In its brief, the respondent states:

"Although Respondent does not admit it violated Section 8(a) (3) and (1) of the Act in terminating Robert O. Hayes, Respondent chooses not to contest in this forum that aspect of the Board's Decision and Order (A-DO, 16–25). During the hearing before the Trial Examiner (citation omitted) Respondent affirmed its willingness to reinstate Hayes, and continues to maintain this position."

Hayes was employed by the respondent from January, 1964, until his discharge in July, 1967. During the period of his employment, he worked first as a truck driver and then as the shop steward at the Chimney Rock plant.

After Hayes voted in the representation election June 17, he received permission from Rufus Jones, an assistant general superintendent of the company, to take off from work because of personal business. While off work, Hayes fell ill and was advised that the illness would require hospitalization. He relayed this information to the company and was told to keep in touch.

During his subsequent sixteen day stay in the hospital, Hayes frequently talked with Superintendent Jones and a dispatcher at the company by telephone and kept them informed as to his progress. In one conversation, Jones told Hayes a release from Hayes' physician and an examination by the company physician would be required before Hayes could return to work.

Hayes was discharged July 5, but remained unable to return to work. He reported this fact to Jones and was told a pending strike had idled half of the company's trucks. While recuperating, he attended a meeting of the Independent union, at which the possibility of retaining the union was discussed. Hayes engaged in a heated argument with another employee and announced his support for dissolving the union and supporting the Teamsters.

Hayes eventually received permission from his physician to return to work July 18 but was informed by Jones that no work was then available. He telephoned again July 20 and was told he had been replaced. He was similarly advised the following day.

When Hayes returned to the plant July 22 to pick up his vacation pay, Jones told him that because of the slack season he could not let some of the new men go and rehire Hayes, as Hayes requested. Hayes told him that he had enjoyed working for the company and that he respected Jones. Jones replied,

"You've always been a good driver for me."

We have before us once again the familiar dialogue of the employer claiming the employee was discharged for legitimate cause and the General Counsel claiming he was discharged illegally. The respondent contended at the hearing that it became necessary to replace Hayes when he became ill and there was no work available when he was able to return to work. It further claimed that Hayes failed and refused to comply with the company policy of having an employee obtain discharge papers from his physician and then submit to an examination by the company physician.

On the other hand, the General Counsel contended, and the Board found, that Hayes was discharged because of his union activities. Hayes had signed a Teamsters authorization card during the course of the representation campaign and had held a party for employees at which a Teamsters representative was present and persuaded them to vote for the Teamsters. The respondent's knowledge of Hayes' union activity can be inferred from the fact that President Drennan suggested that Carrico replace Hayes as an observer because he was a "good Teamster".

The conflict in testimony and matter of witness credibility was for the trial examiner and Board, and not this Court to resolve, Great Atlantic and Pacific Tea Co. v. N. L. R. B., 5 Cir., 1966, 354 F.2d 707. The trial examiner found that the respondent's explanation for Hayes' discharge were mere pretext, since there was no evidence that Hayes refused to comply with the company's policy regarding employees who had been ill and off work, and the company's assertion of the existence of a work shortage was controverted by the fact that it had hired three additional truckdrivers during Hayes' absence. In light of this, we think the Board was amply justified in finding that the real reason for Hayes' discharge was his support of the Teamsters.

## II

### The Scope of the Board's Order

In response to the Board's petition, the respondent raises objections to several parts of the Board's order.

A. With regard to the § 8(a) (1) violation, the Board ordered the company to cease and desist from

"Interrogating employees about their or other employees union membership, activities, or desires * * *."

The objection to this part of the order, which forbids *all* forms of interrogation, is well taken. We have previously stated, in holding a similar order too broad:

"We agree with respondent's contention that the order should not prohibit casual, moderate interrogation which could not be considered as threats, coercion or as forecasting reprisals. Such interrogation is not unlawful per se under the N. L. R. A. N. L. R. B. v. J. Weingarten, Inc., 339 F.2d 498 (5 Cir., 1964); N. L. R. B. v. Hill and Hill Truck Line, Inc., 266 F.2d 883, 886 (5 Cir., 1959); N. L. R. B. v. McGahey, 233 F.2d 406, 409–410 (5 Cir., 1957); Jacksonville Paper Co. v. N. L. R. B., 137 F.2d 148, 152 (5 Cir., 1943). Only when interrogation tends to restrain, coerce or interfere with employees in the exercise of their rights under the Act is such interrogation proscribed by Section 8 (a) (1)."

N. L. R. B. v. Sunnyland Packing Co., 5 Cir., 1966, 369 F.2d 787, 793. Accordingly, this portion of the order should be modified to prohibit only that interrogation which interferes with, restrains, or coerces the employees in the exercise of their § 7 rights.

B. The Notice which was to be posted in the respondent's plants required it to promise that

"WE WILL NOT ask employees about their or other employees' membership in or activities for General Drivers, Warehousemen and Helpers, Local Union No. 968, affiliated with International Brotherhood of Team-

sters, Chauffeurs, Warehousemen and Helpers of America, *or any other union.*"

Although another union did participate in the election here, which might under other circumstances warrant inclusion of the phrase "or any other union" in the Notice see N. L. R. B. v. Scherer & Sons, Inc., 5 Cir., 1966, 370 F.2d 12, there is nothing in the record to suggest that the respondent will engage in an unfair labor practice with that or any other labor organization, N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5 Cir., 1961, 293 F.2d 300. Furthermore, we do not have here a situation "where the company's past history of labor violations indicates the need for such a broad order", N. L. R. B. v. Coca-Cola Bottling Co., supra at 310. The Notice should be altered to delete the phrase "or any other union".

C. Finally, respondent objects to that part of the order which prohibits it from

*"In any other manner,* interfering with, restraining, or coercing its employees in the exercise of their rights * * *."

We do not think the respondent's conduct in the election campaign was harsh enough to merit this prohibition. The courts have long been hesitant to extend the order beyond the scope of the particular unfair labor practices which were committed. As the Supreme Court has said,

"[T]o justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."

N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 85 L.Ed. 930 (1941). See, also, N. L. R. B. v. Mayes Bros., Inc., 5 Cir., 1967, 383 F.2d 242. Those factors are not present here. Therefore, this part of the Board's order should be modified to prohibit the respondent from interfering with, restraining, or coercing its employees in any "like or related manner".

The Board's order is enforced as modified.