**SWEENEY & COMPANY, Inc., Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

**No. 28121.**

United States Court of Appeals, Fifth Circuit.

Jan. 25, 1971.

R. Glenn Jarvis, Scott Toothaker, McAllen, Tex., for petitioner; Ewers, Toothaker, Ewers, Abbott & Evins, McAllen, Tex., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D.C., Clifford Potter, Regional Director, N. L. R. B., Houston, Tex., for respondent.

Mullinax, Wells, Mauzy & Collins by L. N. D. Wells, Jr., and G. William Baab, Dallas, Tex., for intervenor Amal. Meat Cutters, etc.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This case is before the court on petition to review and set aside, and cross-application to enforce, an order of the National Labor Relations Board. The Board held, contrary to the trial examiner's findings, that Sweeney & Company, petitioner herein, violated Sections 8(a) (1), (3) and (5) of the Labor Management Relations Act by (1) refusing to bargain in good faith with Amalgamated Meat Cutters and Butcher Workmen of North America [the Union], (2) interfering with its employees in the exercise of their Section 7 rights, (3) discriminatorily discharging an employee for union activity, and (4) refusing to reinstate unfair labor practice strikers upon their unconditional offer of reinstatement and termination of the strike.

From the Board's decision and order,[1] the following statement of facts appears.

"Respondent [Sweeney & Co.—petitioner on appeal], a wholesale grocery operation, is engaged in the sale and delivery of groceries to retail stores from the warehouses it operates in San Antonio, Laredo, and McAllen, Texas. McAllen, the facility involved herein, is the only one of Respondent's warehouses where employees are represented by a union. The McAllen warehouse is divided into three basic departments: IBM, produce, and grocery. The IBM department's principal function is inventory control of merchandise in the warehouse and the handling of customer orders and billing. The produce and grocery departments constitute the warehouse proper. The primary function of the produce department is the supply of fruits and vegetables to Respondent's customers. It has 8 to 10 employees and their hours of work vary according to need. The grocery department is the principal department of the warehouse and it has some 20 to 25 employees. Since 1966, the employees in these departments have worked in two shifts.

"Until December 1967 Respondent also operated at McAllen a Home Center Department which carried some 1,500 products such as kitchen utensils, hardware materials and several items of clothing. Sometime prior to October 1967, corporate officials in San Antonio decided to transfer the home center operations from McAllen to a similar department at its San Antonio warehouse. Upon being so directed, plant manager Miller began to deplete home center merchandise at McAllen and have customers place their orders at San Antonio. By December 1967 the home center operations at McAllen were completely phased out.

"In the spring of 1966 the Union began an organizing campaign among Respondent's McAllen employees. After a hearing on the Union's petition, the Regional Director directed an election in a unit of approximately 47 employees consisting of:

All employees, including warehousemen and helpers, truckdrivers, and clerical employees, employed at the Employer's facility at McAllen, Texas, excluding all buyers, salesmen, guards, watchmen and supervisors as defined in the Act.

The Union received a majority of the ballots cast in the election held September 19, 1966, and was certified as exclusive collective-bargaining representative on September 26, 1966. Thereafter, Respondent and the Union participated in bargaining sessions on January 10, 1967, and frequently thereafter until their last meeting on April 19, 1968."

It is against this factual backdrop that we must critically examine the record as a whole to determine if the evidence adduced is substantial enough in character to be supportive of the Board's order. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We turn our attention first to the Board's finding that Ernest Hodges is a supervisor within the meaning of § 2(11) of the Act[2] and his statements to employee Garza, containing a promise of economic benefit should the Union be abandoned, were violative of § 8(a) (1).

---

1. 176 NLRB 27.

2. Section 2(11) of the Act [29 U.S.C. § 152(11)] provides:
   "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The trial examiner made the following findings of fact relevant to Hodges' purported supervisory status:

"Hodges has worked for the Company for approximately 7 years, and was employed as a shipping clerk. He worked the day shift until March of 1966, when the night shift was set up in the grocery department. Hodges testified that his duties as a shipping clerk on the night shift include the taking of orders from I.B.M. and laying them out for the order-pullers, that he marks the door at which they are to be loaded depending on the size trailer needed, and that he spends 'most' of his time checking the orders out to make certain they are correct. Hodges states that he seldom has to ask anyone on the night shift (from 8 to 10 employees) to pull orders because it is largely routine work and each employee is familiar with his job. Hodges testified there have been occasions where night shift employees in the grocery department would ask for time off, and if the reason was sickness or 'something like that' he would let him go 'automatically,' and if time-off was requested for other good reasons he would generally let the man off and consult with Plant Manager Miller about it or call Miller. He also related in his testimony, that the employees do not require any indication from him as to the time to leave at the end of the work shift, and they do not inquire whether they can leave. Hodges testified he has no authority to hire or fire employees nor to recommend any such actions, and his authority to discipline employees merely extends to talking to them, and if no mutual agreement is reached they will then see Plant Manager Miller about it. Hodges admitted he has 'moved employees around' when work in the drug department is caught up and extra help was needed elsewhere in the warehouse, and on occasions he has also informed employees that there is additional work to be done before leaving. Rudy Garza testified he received permission from Hodges to leave work on numerous occasions, however, Hodges testified that when this occurred, Garza always told him that Miller had given him permission to be off work. Garza also testified concerning an incident which occurred the latter part of 1966 when Hodges had asked him to move some charcoal from a location in the warehouse. Garza testified he told Hodges he was not going to move the charcoal as Homer Isenberg had previously instructed him to place them on the north side. Both Hodges and Garza became quite excited and annoyed over this incident, and Hodges then informed Garza he was fired, but Garza replied that Hodges could not fire him because he had been hired by Isenberg. Garza testified that Isenberg then came upon the scene and told Garza that Hodges had the authority to fire him but also informed him that Hodges would not 'bother' him any more. Hodges stated that he did get a little angry and he did tell Garza he was fired but, '* * * I was a little angry and I didn't have the right to say that, and I went to see Mr. Isenberg about it a little later, and he took care of it from there.' It appears that Garza continued to work up until the strike in February of 1968.

"Hector Garcia stated that in late 1965 or early 1966, Hodges told him he was needed downstairs in the warehouse to help on various jobs, and Garcia informed Hodges he had to take care of the home center department first. Plant Manager Miller then walked by and Hodges told Miller, 'Hector is getting pretty smart with me.' According to Garcia, Hodges then informed him that if he did not like the way he was running the warehouse 'why don't you clock out and go home.' Garcia also testified that Miller then states, 'Well, he is your boss, he can tell you what to do, Hector.' Garcia further related that he considered Hodges his supervisor on the night shift, that Hodges in-

structed the employees what to do and shifted employees from one job to another."

The record also reflects that Hodges was initially hired on a weekly salary basis, thus entitling him to two weeks' vacation, whereas other employees received 1 week vacation. However, due to subsequent wage and hour audits, it was determined that Hodges, as a non-supervisory warehouse employee, should be changed to an hourly rate. This was effectuated in January, 1966, and consonant with company policies, Hodges' accrued benefits were not reduced.

The trial examiner concluded that there was no credible testimony that Hodges had any general or overriding authority to excuse employees except under routine circumstances or where prior permission had been obtained. Likewise, he concluded that Hodges had no authority to discharge, nor could he effectively recommend the discharge of another employee. The Board, while apparently not upsetting the trial examiner's credibility choices, arrived at a contrary conclusion.

■■■ The Board's decision on the factual question of Hodges' supervisorial status is conclusive if supported by substantial evidence. Pulley v. N.L.R.B., 395 F.2d 870 (6th Cir. 1968). Moreover, because the statutory criteria of a supervisor, note 2, *supra*, are set forth in the disjunctive, the exercise of any one of these functions by an employee is sufficient to bring him within the statutory definition. Federal Compress & Warehouse Co. v. N.L.R.B., 398 F.2d 631 (6th Cir. 1968). Yet critical to the finding of supervisory status is the further statutory requirement that the exercise of such authority be not merely routine or clerical in nature, but require the use of independent judgment. It is in this particular that the Board's conclusion concerning Hodges' authority is deficient. It is clear that Hodges' higher pay, longer vacation time, direction of employees and granting of time off, under the circumstances credited by the trial examiner, were not determinative in the Board's conclusion that Hodges was a supervisor for these indicia of authority were likewise possessed by Donald Bennett, a day shift employee, and the Board adopted the trial examiner's findings and conclusion that Bennett was *not* a supervisor within the meaning of the Act. It is apparent therefore that the Board relied heavily on the two occasions above-mentioned wherein Hodges, in a heated conversation with a fellow employee, told that employee he was discharged. While the trial examiner set forth in detail his reasoning in concluding that Hodges had not exercised independent judgment and did not have the authority to effectively recommend the discharge of another employee, there is a conspicuous absence of these two factors in the Board's contrary conclusion based upon the same facts. Likewise, the Board places great emphasis on the "fact" that Hodges is the sole representative of management in the grocery department on a regular basis and during substantial periods on the night shift to bolster its conclusion that Hodges is possessed of supervisory authority. Yet the status of Hodges as a representative of management is the very issue being litigated and the Board's bootstrap conclusion in this regard does not constitute substantial evidence. The record clearly reflects that Hodges' attempted discharge and threat of discharge of employees Garza and Garcia was done in a moment of anger, nullified by management and later admitted by Hodges that he had no right to say the things he did. It further appears that Hodges had no authority to *effectively* recommend such action as employee Garza continued in the employ of Sweeney & Company until the commencement of the strike and Garcia continued in the home center department where he worked until the department was discontinued for economic reasons.

■■■ We simply cannot, in good conscience, say there is sufficient evidence on the record as a whole to support the Board's conclusion that employee Hodges

was a supervisor. *Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. 456, 95 L.Ed. 456. As a result, any statements made by Hodges as a non-supervisory employee are not attributable to management and the Board's finding that Hodges' remarks to fellow employees constituted a violation of § 8(a) (1) of the Act is set aside.

■■ The Board further found the company in violation of § 8(a) (1) of the Act through remarks by supervisor Villerreal to employees Islas and Guajardo. Villerreal admitted telling Islas that the company's employees at the San Antonio and Laredo facilities [both nonunion] were receiving better benefits, in the form of longer vacations and a credit union, than the employees at the McAllen facility, but that the men in McAllen would get the same "once matters got straightened out." The trial examiner found—and the Board agreed—that Villerreal's statements concerning increased benefits at the non-union facilities and then comparing them with the situation at McAllen and relating it to the presence of the Union bargaining representative, constituted a solicitation of an employee to cease his union activity with the implied promise of increased benefits for having done so. The inference drawn by the Board is clearly permissible and its conclusion that such conduct violated § 8(a) (1) of the Act is supported by substantial evidence. Similarly, there is substantial evidence to support the Board's finding that petitioner violated § 8(a) (1) by Villerreal's statements to employee Guajardo. The record reflects that the grocery department employees were receiving a 20-cent night shift premium while the employees in the produce department did not receive this night-shift differential. Guajardo testified that Villerreal told him that he (Villerreal) had requested plant manager Miller to get the 20-cent night shift premium for the produce department employees, but Miller had responded that he could do nothing "until the negotiations were over or until we were back to the way we were before." The

trial examiner found that this statement did not violate § 8(a) (1) of that Act even accepting Guajardo's version as true. The trial examiner, however, seemingly did not address himself to the second clause of Miller's statement, i. e., "or until we were back to the way we were before." The Board concluded that the import of Villerreal's statement was that but for the presence of the Union, produce department employees would have received the long withheld night-shift premium. Taken with the corresponding remarks to Islas by Villerreal, this inference by the Board is reasonably supported. While the trial examiner chose to view it differently, we may not, as a reviewing court "displace the Board's choice between two fairly conflicting views, * * *" N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); N. L. R. B. v. Tesoro Petroleum Corp., 431 F.2d 95 (9th Cir. 1970).

We turn our attention next to the discharge of Hector Garcia—an act the Board found to be discriminatorily motivated and in violation of § 8(a) (3) of the Act. Garcia was hired by the company in 1959 and worked until his discharge on December 16, 1967. It is undisputed that during the period of Garcia's employment he was never discharged, suspended, laid off or given a written warning concerning the manner in which he performed his work. He was on one occasion even complimented for obtaining a new customer for his employer. The record further reflects that Garcia performed virtually every job in the warehouse, including the operation of the forklift and tow motor equipment used in filling orders.

Sometime prior to October 1967, a decision was made by the company to close the home center and cigarette stamping department at the McAllen warehouse and transfer that operation to the San Antonio facility. Plant manager Miller received a letter from the company's president, dated October 16, 1967, informing him of the proposed action and advising him to arrange the depletion of

the home center merchandise. By letter dated November 30, 1967, the company notified the Union it would discontinue the home center department and that such action might result in the permanent reduction of one or two employees. On December 16, 1967, Garcia was told by Mr. Miller that he was discharged— the reason being that the home center and cigarette department had been discontinued. The trial examiner found— and the Board agreed—that the discontinuance of the home center department was justified for business reasons. However, our inquiry does not end here.

■■ It is undisputed that the company was aware of Garcia's key role in the Union movement, including his acting as a Union observer during the 1966 representation election and serving as an employee member of the Union negotiating team. While this court is fully cognizant that being an ardent supporter and protagonist of the Union does not insulate an employee against discharge for justifiable cause, N. L. R. B. v. Winn-Dixie Stores, Inc., 410 F.2d 1119 (5th Cir. 1969), we are likewise aware that the existence of valid grounds for discharge is no defense to an 8(a) (3) unfair labor practice charge when discriminatory motive is a factor in the employer's decision. Singer Co. v. N. L. R. B., 429 F.2d 172 (8th Cir. 1970); N. L. R. B. v. Hanes Hosiery Division, Hanes Corp., 413 F.2d 457 (4th Cir. 1969); Winchester Spinning Corp. v. N. L. R. B., 402 F.2d 299 (4th Cir. 1968). Moreover, it need not be shown that the proscribed motive was "dominant"—for general counsel carries his burden when it is shown that the employee would not have been discharged but for the anti-union animus of the employer, N. L. R. B. v. Whitfield Pickle Co., 374 F.2d 576 (5th Cir. 1967), or that in the absence of his union activities, the employee would have been treated differently. Frosty Morn Meats, Inc. v. N. L. R. B., 296 F.2d 617 (5th Cir. 1961).

■ We have meticulously and with great effort digested the more than 1,000 pages contained in the record in this case. Viewing that record as a whole and considering the totality of the circumstances, we conclude that the Board's finding of discriminatory discharge in violation of § 8(a) (3) of the Act is "Based upon such relevant evidence as a reasonable mind might accept as adequate to support it". N. L. R. B. v. O. A. Fuller Supermarkets, Inc., 374 F.2d 197, 200 (5th Cir. 1967).

We are not unduly disturbed by the trial examiner's contrary conclusion for "[T]he initial choice between two equally conflicting inferences of discriminatory or non-discriminatory employer motivation for an employee discharge is primarily the province of the Board, * * *" N. L. R. B. v. Coats & Clark, Inc., 231 F.2d 567, 572 (5th Cir. 1956). The inference here drawn by the Board was clearly reasonable and supported by a substantial evidentiary base. In addition to Garcia's satisfactory work record previously noted, the evidence established that the company's employees were working a substantial amount of overtime on a regular basis—work which Garcia was qualified to perform. Although Miller testified that the addition of one employee would not have had a substantial impact on the amount of overtime of the other employees—that statement was clearly hindsight for Miller candidly admitted that he had not made a study of it at the time of Garcia's discharge. "The knowledge and motive of the employer at the time of the discharge control the question whether a discriminatory purpose was involved, and not what the employer may have learned at a later date." United States Rubber Company v. N. L. R. B., 384 F.2d 660, 663 (5th Cir. 1968).

The above facts taken together with (1) the company's manifest opposition to the union; (2) the hiring of a new employee approximately 3 weeks prior to Garcia's discharge to perform a task Garcia was qualified to do, and after the decision to discontinue the home center had been made; and (3) the precipitate nature in which Garcia learned of his discharge, collectively evidence a course

of conduct by the employer which is totally inconsistent with the treatment of an employee in Garcia's circumstances but for his union affiliations. The Board drew a proper inference from these facts and its order requiring the petitioner to offer Garcia reinstatement and to make him whole will be enforced.

■ The condemnation of "bad faith" in collective bargaining involves, in final analysis, the motives of the parties manifested within the factual matrix of the bargaining process. The Board has concluded upon the record in this case that Sweeney & Company failed to bargain in good faith in violation of § 8(a) (5) of the Act. The question of when a party has discharged its obligation of good faith in the bargaining process is the subject matter of a plethora of judicial decisions. This court has stated the obligation of the employer in the following language:

> "The obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained. * * *
>
> * * * * * *
>
> [W]hile the employer is assured these valuable rights, he may not use them as a cloak. In approaching it from this vantage, one must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere 'surface bargaining,' or 'shadow boxing to a draw,' or 'giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining.'" (footnotes omitted)

N.L.R.B. v. Herman Sausage Co., 275 F.2d 229, 231–232 (5th Cir. 1960)

We are convinced the Board's conclusion that Sweeney & Company violated § 8(a) (5) of the Act by failing to discharge its obligation of bargaining with the union in good faith is supported by substantial evidence on the record as a whole.

It would unduly prolong this opinion and serve little purpose to chronologically explicate the 13 bargaining sessions covering a period of 13 months prior to the date the union went out on strike in protest of the company's failure to bargain in good faith and the discriminatory discharge of Hector Garcia. However, a succinct statement of the facts which led the Board to conclude that the company evinced bad faith is in order.

The first bargaining session was held on January 10, 1967. At this initial session, the company stated its opposition to (1) contract retroactivity to date of certification; (2) maintenance of standards clause; (3) any provision concerning seniority; and (4) checkoff of union dues or union security. With reference to the proposed checkoff provision, the company stated that it was the union's business and obligation—no suggestion of inconvenience or other business reason was given, nor could there have been for the company was presently deducting amounts from employee paychecks for uniforms and insurance benefits. The company throughout the negotiations adamantly refused to consider the inclusion of a checkoff provision in the collective bargaining agreement and at the final bargaining session on April 19, 1968, subsequent to the strike, the company informed the union that it was "philosophically opposed" to checkoff of union dues. In this regard, the District of Columbia Circuit recently stated that:

> "Section 8(d) of the Act, which expressly requires the parties to meet 'and confer in good faith with respect to * * * terms and conditions of employment,' establishes a duty that is a salient and integral part of the duty 'to bargain collectively' set forth in § 8(a) (5). The subject of dues checkoff is a mandatory subject of bargaining under §§ 8(a) (5) and 8(d) * *.

In another phrase § 8(d) provides that the statutory duty does not compel a party 'to agree to a proposal or require the making of a concession.' However this qualification does not permit an employer—by a mere claim that it was only engaged in 'hard bargaining' on the checkoff—to escape condemnation when it has refused to bargain in good faith. This proposition is clear enough when the party's good faith is negatived by its purpose to frustrate any agreement whatever. We think it is equally clear that a company (or union) may not assume an intransigent position in bad faith on a mandatory subject of bargaining even though its purpose to frustrate an agreement on that issue coincides with a willingness to reach some overall agreement." (footnotes omitted)

United Steelworkers of America v. N. L. R. B., 129 U.S.App.D.C. 80, 390 F. 2d 846, 849 (1967), cert. denied, Roanoke Iron & Bridge Works, Inc. v. N. L. R. B., 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968).

From the totality of the employer's conduct exhibited in the circumstances of the instant case, the inference of bad faith drawn by the Board is not only proper but compelling. The union, on numerous occasions, stated that the checkoff provision was an essential item for inclusion in the collective bargaining agreement but that the union was flexible and if the company would make some concessions, particularly in the realm of economic items, that an agreement could be reached. No company concessions were forthcoming.

We are likewise of the view that the company's predictably unacceptable economic proposal, its disparate treatment of the union employees at the McAllen plant and the unrepresented employees at the Laredo and San Antonio plants—with regard to wages and vacation benefits—and bringing this disparity to the attention of the union members via the 8(a) (1) violations previously noted, lend further support to the Board's conclusion that the company was predetermined not to reach agreement.

On February 11, 1968, the union employees walked out on strike—having previously voted to take that action in protest of the company's unlawful discharge of employee Garcia and the refusal of the company to bargain in good faith. From our foregoing conclusions, it cannot be gainsaid that this constituted an unfair labor practice strike and as such, the strikers were entitled to full reinstatement upon their unconditional offer to return to work. N. L. R. B. v. Safway Steel Scaffolds Co. of Georgia, 383 F.2d 273 (5th Cir. 1967), cert. denied, 390 U.S. 955, 88 S. Ct. 1052, 19 L.Ed.2d 1150 (1968).

Finally, the company objects to that part of the Board's order which prohibits it from

"(b) Discouraging membership in or activities on behalf of Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local 173, *or any other labor organization,* by discriminatory selection of union supporters for discharge, or by terminating the employee status of unfair labor practice strikes by denying them reinstatement upon their unconditional application to return to work, or by *in any other manner* discriminating against an employee in regard to his hire, tenure, or other terms and conditions of employment."

\* \* \* \* \* \*

"(d) *In any other manner* interfering with, restraining, or coercing employees in the exercise of their right to self-organization, to form, join, or assist Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local 173, *or any other labor organization,* to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for purposes of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities." (emphasis supplied)

The evidence on the present record is wholly lacking in those indicia of employer conduct which would justify this broad prohibition. N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

Therefore, that part of the Board's order in paragraph (b) and (d) which reads "or any other labor organization", shall be deleted and that part of the Board's order in paragraph (b) and (d) which reads "in any other manner", shall be deleted and the words "in any like or related manner" shall be substituted in lieu thereof. See N. L. R. B. v. Builders Supply Co. of Houston, 410 F. 2d 606 (5th Cir. 1969).

Enforcement of the Board's order is denied in part; granted in part as modified.