726 F.2d 705
 115 L.R.R.M. (BNA) 3224, 100 Lab.Cas. P 10,852
 BELCHER TOWING COMPANY, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
District 2, Marine Engineers Beneficial
Association-Associated Maritime Officers, AFL-CIO,
Intervenor-Respondent.
 No. 82-6163.
 United States Court of Appeals,
Eleventh Circuit.
 March 9, 1984.
 
 Ford & Harrison, G. Paris Sykes, Jr., John P. Campbell, Atlanta, Ga., Mary K. Higginbotham, Houston, Tex., for petitioner, cross-respondent.
 Elliott Moore, Deputy Associate Gen. Counsel, Joseph Frankl, N.L.R.B., Washington, D.C., for N.L.R.B.
 Joel C. Glanstein, O'Donnell & Schwartz, New York City, for District 2, Marine Engineers Beneficial Assn.
 Petitions for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD*, District Judge.
 PER CURIAM:
 
 
 1
 Belcher Towing Company appeals from a decision of the National Labor Relations Board, which adopted the findings of its administrative law judge, and held that the company violated Sec. 8(a)(1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), by its conduct in 1979 and early 1980 during the election campaign conducted by the Marine Engineers Beneficial Association among the company's employees. The Board then ordered that a new election be held. On appeal, the company challenges virtually every aspect of the Board's decision, but places primary emphasis on four issues: I. whether the Board erred in holding that the company engaged in illegal surveillance of union activities; II. whether the NLRB order was vague and overbroad; III. whether it was error to deem the granting of a salary increase an unfair labor practice; and IV. whether the Board erred in characterizing as coercive a handbill distributed to employees indicating that the company would bargain from "ground zero" if the union was elected, in violation of the Act.
 
 
 2
 I. Surveillance and Conveying the Impression of Surveillance
 
 
 3
 of Union Activities
 
 
 4
 At some point during the latter part of 1978, two representatives of Belcher Towing management conducted a seminar for the company's captains and other supervisory employees. At that seminar, a document was distributed to the captains entitled "Weekly Analysis." The purpose of the form was to facilitate the recording of information concerning employees' attitudes toward unionization. The captains were encouraged to engage their crew members in conversation, to listen to their grievances, to talk to dissatisfied employees before they sought relief from a union, and to use the weekly analysis forms to report any information overheard or gleaned from such conversations.
 
 
 5
 Surveillance by means of the weekly analysis forms was unknown to the employees until May of 1979, when crewman David Ellison picked up a blank weekly analysis form that had been dropped by a company captain. A week later, he found a number of the forms in a filing cabinet and showed a copy to several other persons, including the secretary-treasurer of the union. There is evidence that the weekly analysis forms continued to be used at least through March of 1980.
 
 
 6
 The record contains testimony concerning a number of conversations between captains and crew members, taking place over the course of the two years following the seminar at which the weekly analysis forms were introduced. One captain asked a crew member if he had signed a union card. A second captain stated to another crew member that "I don't want you to tell nobody because I'll lose my source of information, but I was told you was a union plant," and intimated that union organizers were at risk of losing their jobs. The same crewman who was asked if he was a "union plant" sought a company letter of recommendation from a third captain; the captain asked the crewman if he supported the union, the crewman responded that he did not, and the request was granted. Finally, a fourth captain was reported to have said to a number of crewmen that "anybody that's found out to be pro-union, they's going to be fired." That same captain admonished a member of his crew that if he had signed a union card, one of the only ways he would be able to save his job would be to apologize to management for having done so, and to promise that he would vote for the company at the election.[1]
 
 
 7
 In NLRB v. Computed Time Corporation, 587 F.2d 790, 794 (5th Cir.1979), the Fifth Circuit noted that "[i]n order for an employer to violate Section 8(a)(1) by illegal surveillance, interrogation or any other unlawful act, he must 'interfere with, restrain, [or] coerce' employees in the exercise of their Section 7 rights." The clear implication of the court's observation is that absent a tendency to coerce, surveillance or creating the impression of surveillance does not constitute a Sec. 8(a)(1) violation. United States Steel Corp. v. NLRB, 682 F.2d 98, 101 (3d Cir.1982) (interpreting the Fifth Circuit's decision in Computed Time Corp. to mean that "surveillance by itself ... does not violate the Act"); see also NLRB v. Mueller Brass Co., 509 F.2d 704, 708 (5th Cir.1975). On the other hand, it is well settled that the operative question is whether the surveillance tends to be coercive, and not whether employees are in fact coerced. Sturgis Newport Business Forms, Inc. v. NLRB, 563 F.2d 1252, 1256 (5th Cir.1977). Moreover, courts have recognized that surveillance or conveying the impression of surveillance of employees' union activity, while not a per se violation of the Act, can have a natural, if not presumptive, tendency to discourage such activity.[2] Keeping in mind that surveillance or conveying the impression of surveillance can easily tend to be coercive, we turn to appellant Belcher Towing's claim that the NLRB erred in holding that the company's surveillance and interrogation of its employees was coercive and therefore in violation of Sec. 8(a)(1) of the Act.
 
 
 8
 The appellant argues first that the opinions of company supervisors as to the union sentiments of individual employees, and the weekly analysis forms used to record those opinions, constitute speech protected by the first amendment. The first amendment, together with Sec. 8(c) of the Act, guarantees to employers "the right to express any views, argument or opinion, or the dissemination thereof, whether in written, printed, graphic or visual form." 29 U.S.C. Sec. 158(c); NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). That right exists, however, only insofar as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. Sec. 158(c). An employer loses the protection of Sec. 8(c) and the first amendment, to the extent that the expression tends to coerce, rather than to inform. Bulk Transport, Inc. v. NLRB, 608 F.2d 311, 314-15 (8th Cir.1979); NLRB v. Automotive Controls Corp., 406 F.2d 221, 223 (10th Cir.1969). Because an employer's free speech rights end where a Sec. 8(a) violation begins, appellant's claim that the company's surveillance tactics were protected speech, merely returns us full circle to the original question: whether Belcher Towing's surveillance tactics were coercive, in violation of Sec. 8(a)(1).
 
 
 9
 The company argues second, that by virtue of being in close quarters on board ship for most if not all of the working day, supervisors and crew members must unavoidably observe and overhear one another, and that because such surveillance is inescapable, it cannot be deemed coercive or otherwise improper. In support of its position, the company relies on the recent NLRB decision of Emenee Accessories, Inc., 267 NLRB No. 213 (Sept. 30, 1983). In Emenee Accessories, a management head stood in front the company's building and observed union organizers conversing with employees who were reporting for work. The Board concluded that "union representatives and employees who choose to engage in their union activities at the employer's premises should have no cause to complain that management observes them" and dismissed that portion of the complaint. Belcher Towing argues that in the same way the union cannot be heard to complain that it was improper for company captains to be attentive to crew members' conduct or conversations reflecting their attitudes toward the union, when the crew members chose to express their views on company property in unavoidably close proximity to company captains.
 
 
 10
 Emenee Accessories is readily distinguishable. It is one thing for an employer passively to observe union activity "conducted in full public view outside respondent's place of business"; it is another thing altogether for management to encourage its supervisors to elicit information from their employees concerning the employees' attitudes toward unionization, and surreptitiously to record those attitudes on weekly analysis forms. After crewman Ellison discovered the weekly analysis forms, and circulated a copy to his fellow crew members, those employees can have been left with no impression other than that their actions were under company surveillance, which might well instill in the employees a fear of reprisal from their employer, in violation of Sec. 8(a)(1). NLRB v. Mueller Brass Co., 509 F.2d 704, 708 (5th Cir.1975) (the furtive nature of surveillance contributes to its tendency to be coercive); Russell Stover Candies, Inc. v. NLRB, 551 F.2d 204, 207 (8th Cir.1977); Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255, 1268 (7th Cir.1980). Moreover, the actual surveillance of Belcher Towing employees which management sought unsuccessfully to conceal was coupled with a number of instances in which crew members could quite reasonably have been led to believe that management had undertaken to investigate union activity, had access to certain information and records identifying union supporters, and might retaliate against pro-union employees. When these facts are placed in the context of the bitter and long-standing dispute surrounding the efforts to unionize the Belcher Towing work force,[3] we are unable to conclude that there was not substantial evidence in the record to support the Board's conclusion that Belcher Towing's surveillance tactics and conduct conveying the impression of surveillance were coercive.
 
 II. The NLRB Order
 
 11
 The appellant complains that even if the company is held to have violated Sec. 8(a)(1) by its surveillance of Belcher Towing employees, the NLRB's cease and desist order is impermissibly vague and overbroad. The order provides in relevant part:
 
 
 12
 Respondent, Belcher Towing Company, Miami, Florida, its officers, agents, successors and assigns shall:
 
 1. Cease and desist from:
 
 13
 (a) engaging in surveillance of union activity by maintaining a list of pro union employees obtained by closely watching and listening to the conversations of employees and engaging employee [sic] in conversation for the purpose of determining their sympathies for or against unions, thereby interfering with, restraining and coercing employees in the exercise of their Section 7 rights.
 
 
 14
 It is the company's position that the NLRB may not, by virtue of the first amendment and the Labor Relations Act, prohibit management from listening to, talking with or closely watching its employees, and that the NLRB's order is improper in that it may be read to enjoin the company from engaging in such permissible and protected activities. The company is quite right that a Board order may not prohibit conduct not in violation of the Act, and that conferring with, listening to and observing employees are permissible and protected conduct insofar as they are not coercive. NLRB v. Builders Supply Co., 410 F.2d 606, 610 (5th Cir.1969); NLRB v. Milco, 388 F.2d 133 (2d Cir.1968); NLRB v. Century Broadcasting Corp., 419 F.2d 771 (8th Cir.1969).
 
 
 15
 The NLRB's order in this case, however, does not proscribe closely watching, listening to and talking with employees. It does prohibit the company from assembling a list of pro-union employees to the extent that doing so will interfere with, restrain and coerce employees in the exercise of their Section 7 rights.[4] While such a list would be obtained by watching, listening to and conversing with employees, it is the list, not the watching, listening and conversing, that is the subject of the order. Since we have already determined that maintaining surveillance by means of such a list was properly deemed coercive, we conclude that the NLRB's order is not overbroad.
 
 III. The Wage Increase
 
 16
 Stanley Haas, the company's vice president in charge of operations, assumed his position in February, 1977. Haas instituted a wage survey program, in which the salaries paid by competing towing companies would be consulted as a means for determining the appropriate wage increases to be paid Belcher Towing employees. The first of these surveys was begun in mid-1977, completed in late 1977, and resulted in a 17% wage increase in May 1978. A second survey was begun in December 1978, completed in February 1979, and culminated in a 7 1/2% increase in June 1979. (ALJ Dec. at 10-11). The third survey was begun in October 1979. In December, employees were notified that the survey was underway, and that a wage increase was forthcoming. (ALJ Dec. at 10). The survey was completed in January 1980, and on March 10, employees were notified that their salaries would increase by 9%, effective March 20. On March 11, the company and union entered into a stipulation for certification upon consent election, the election to be held on April 23.
 
 
 17
 The Board concluded that the wage increase announced on March 9, 1980 was calculated to interfere with employees' Section 7 rights, in violation of Sec. 8(a)(1). (ALJ Dec. at 30-31). It is unclear as to why the Board so held. On the one hand, the Board intimates that the raise was unfairly delayed; the Board points out that Belcher Towing employees ordinarily received salary increases in tandem with Belcher Oil employees (Belcher Towing's parent corporation), but that Belcher Towing's March 1980 increase came some three months after that sanctioned for Belcher Oil. On the other hand, the March 1980 increase came at least two months earlier than comparable increases in 1978 and 1979, which occurred in May and June, respectively.
 
 
 18
 Increasing the wages of employees does not constitute an unfair labor practice, unless it is done to interfere with, restrain or coerce employees in the exercise of their Section 7 rights. Reading & Bates, Inc. v. NLRB, 403 F.2d 9, 11 (5th Cir.1968). Granting benefits according to a regular time pattern as a means for keeping up with inflation, is to be viewed as a neutral act, regardless of any time relation to a union organizing campaign. Simpson Electric Company v. NLRB, 654 F.2d 15, 17-18 (7th Cir.1981).
 
 
 19
 In this instance, the company announced its plans to conduct a salary survey and increase its employees' salaries in late 1979, as per usual practice. That notification came several months prior to the stipulation to a new election. When the amount and effective date of the raise were announced in March, it can have come as no surprise; the employees had been expecting a salary increase since December, and the percentage of that increase, while a bit higher than for the previous year, was considerably lower than for the year before that. Because the increase followed in the regular pattern of annual increases designed to account for inflation, and could not reasonably be expected to interfere with the employees' efforts to unionize, we hold that the Board erred in its conclusion that the wage increase violated Sec. 8(a)(1).
 
 IV. The Handbill
 
 20
 Sometime after March 27, 1980, the appellant distributed a handbill entitled "If the Union gets in, it's bargaining from ground zero." The handbill stated that there were no guarantees that negotiations would start at the present level of benefits and only go up. The Board held that
 
 
 21
 In the context of the above unfair labor practices and other unfair labor practices hereinafter found, I conclude that the handbill threatening bargaining from "ground zero" ... [was] not mere expression of opinion as to the natural and normal hazards of collective bargaining. Rather, I conclude that employees were left with the impression that, if push came to shove, the Respondent would see to it that the employees lost rather than gained benefits if they voted for the Union.
 
 
 22
 The company argues that this handbill was hard-hitting, but non-threatening, and as such amounted to a legal exercise of free speech by management. In NLRB v. Gissel Packing Co., the Supreme Court stated:
 
 
 23
 An employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control....
 
 
 24
 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547, 580 (1969).
 
 
 25
 The statement that the company would bargain "from ground zero" is a far cry from being carefully phrased. "Bargaining from ground zero," like "bargaining from scratch," "is a dangerous phrase which carries with it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election." TRW-United Greenfield Division v. NLRB, 637 F.2d 410, 420 (5th Cir.1981). Placed in the context of contemporaneous threats and unfair labor practices, the Board properly determined that the handbill tended to be coercive. Id. at 420-21.
 
 V. Other Challenges
 
 26
 The company further challenges a number of the Board's conclusions on the ground that in reaching those conclusions, the Board improperly credited the testimony of some witnesses over others.[5] At oral argument, the company quite rightly conceded that the occasion is rare in which it is appropriate for a court of appeals to disturb the credibility determinations of an administrative law judge or the Board. It is not our function to reweigh evidence or make credibility choices. Mead Corp. v. NLRB, 697 F.2d 1013, 1022 (11th Cir.1983). We are satisfied that the reasons furnished by the Board for its credibility determinations are not inherently contradictory, and consequently that the Board's conclusions reached on the basis of those determinations must be upheld.
 
 
 27
 The company also challenges the Board's conclusion that the suspension of crewman David Ellison, and the denial of diving work to Joseph Gremelsbacker, were precipitated by their union activities. The Board's conclusion that the company's reasons for suspending Ellison and denying Gremelsbacker diving work were merely pretextual is amply supported in the record; the Board's order is therefore affirmed on this point.
 
 
 28
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 We rely upon the findings of the administrative law judge, adopted by the NLRB, as to the substance of the conversations between captains and crewmen. Testimony concerning what transpired during those conversations was occasionally conflicting, making it necessary to credit the testimony of some witnesses over others. We are bound to respect the credibility determinations of the Board in such cases, and consequently accept its findings of fact as accurate. Mead Corporation v. NLRB, 697 F.2d 1013, 1022 (11th Cir.1983)
 
 
 [2]
 Surveillance becomes illegal because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion
 NLRB v. Mueller Brass Co., 509 F.2d 704, 708 (5th Cir.1975), quoting Hendrix Mfg. Co. v. NLRB, 321 F.2d 100 (5th Cir.1963). A number of courts have held that "[a]n employer violates Sec. 8(a)(1) when it conveys to employees the impression that it is engaged in surveillance of their union activities"; implicit in such a holding is the presumption that creating the impression of surveillance is by its very nature coercive. NLRB v. Rich's Precision Foundry, Inc., 667 F.2d 613, 624 (7th Cir.1981); Frito-Lay, Inc. v. NLRB, 585 F.2d 62, 66 (3d Cir.1978); Piggly Wiggly, Tuscaloosa Division v. NLRB, 705 F.2d 1537, 1541 (11th Cir.1983). See also R. Gorman, Labor Law 172-73 (1976).
 
 
 [3]
 The organizational drive to unionize Belcher Towing is now in its ninth year. (Recommended Decision and Order of the Administrative Law Judge at 2-3). In the course of that drive, the company has previously been held to have committed a number of unfair labor practices. See Belcher Towing Co. v. NLRB, 614 F.2d 88 (5th Cir.1980). In determining whether a given act of interrogation or surveillance is coercive, it is appropriate to consider the history of the company's conduct and attitude toward its employees. NLRB v. Varo, Inc., 425 F.2d 293 (5th Cir.1970); Mel Croan Motors, Inc. v. NLRB, 395 F.2d 154, 156 (5th Cir.1968)
 
 
 [4]
 The language of the order indicates that maintaining a list of pro-union employees "thereby," i.e. necessarily, interferes with the Section 7 rights of employees, and is therefore prohibited. Ordinarily, it might be more appropriate to proscribe the maintaining of only those lists that would interfere with the Section 7 rights of employees. NLRB v. Builders Supply Co. of Houston, 410 F.2d 606, 610 (5th Cir.1969). In the context of this case, however, the NLRB was amply justified in concluding that maintaining any such list would necessarily be coercive (see discussion of Section I, supra)
 
 
 [5]
 Specifically, the company challenges the following determinations: that management threatened to withdraw certain existing benefits, that supervisors conveyed an illegal impression of surveillance (see note 1, supra), and that supervisors illegally interrogated crew members