The **MEAD CORPORATION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 81–7664.

United States Court of Appeals, Eleventh Circuit.

Feb. 11, 1983.

Smith & Schnacke, Robert J. Brown, Dayton, Ohio, for petitioner.

William M. Bernstein, Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before HILL and CLARK, Circuit Judges, and SCOTT,* District Judge.

CHARLES R. SCOTT, District Judge:

This case is before the Court upon a petition filed by The Mead Corporation

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, sitting by designation.

(hereinafter 'Company') pursuant to Section 10(f) of the National Labor Relations Act (hereinafter 'Act') and Rule 15 of the Federal Rules of Appellate Procedure to set aside the decision of the National Labor Relations Board (hereinafter 'NLRB' or 'Board'). The NLRB has filed a cross-application for enforcement of its order pursuant to Section 10(e) of the Act.

The Printing Specialties & Paper Products Union Local 527 (hereinafter 'Union'), which represents the production and maintenance employees at the Company's plant in Atlanta, Georgia, filed two consolidated complaints with the NLRB. The Union alleged that the Company withdrew a proposal concerning wage rate adjustments knowing that acceptance of the proposal by the Union was imminent and, therefore, refused to bargain in good faith in violation of Sections 8(a)(1) and (5) of the Act. The Union further alleged that the Company interrogated and threatened its employees who engaged in union activities and prohibited them from writing grievances during working hours, contrary to prior Company practice, all in violation of Section 8(a)(1) of the Act. A hearing was held before an administrative law judge (hereinafter 'ALJ') who found that the Company had violated Sections 8(a)(1) and (5) of the Act by refusing to bargain in good faith and had violated Section 8(a)(1) of the Act by interfering with the right of its employees to engage in union activities. The ALJ recommended that the Company be ordered to cease and desist from the conduct found to be violative of the Act and that the Company further be ordered to bargain in good faith with the Union upon request with regard to wages, hours and other terms and conditions of employment.

A three-member panel of the NLRB affirmed the decision of the ALJ but modified the proposed remedy by further ordering the Company to reinstate for 20 consecutive days the Company's proposal of August 27, 1979 which was found to have been unlaw-

fully withdrawn.[1] On petition for judicial review, the Company contends that the NLRB erred in finding violations of the Act and, in the alternative, argues that the Board's remedial order is improper.

*Refusal to Bargain in Good Faith*

The Company and the Union have negotiated and executed a series of collective-bargaining agreements since approximately 1963. The collective-bargaining agreement at issue in the case at bar was in effect from February 15, 1979 through February 15, 1981. Articles XXIII and XXVII of the collective-bargaining agreement provide as follows:

### RATES FOR NEW OR CHANGED JOBS
### Article XXIII

When the installation of new type equipment necessitates the creation of a new job classification, the Union will be so notified. The Company shall establish a rate for this classification in line with the current wage scale for like work. This rate shall stand for a period of ninety (90) days. If at the end of the ninety (90) day period neither party has questioned the rate established for the new job classification, it shall become the established rate for the new job and shall be treated as any other part of the wage scale. The establishment of such rates will be a matter for negotiation.

When a change in methods necessitates the elimination of a job classification, or changes in the job responsibilities of existing job classifications, the Company shall establish rates for the job classification thus affected, in line with the current wage scale for like work. This rate shall stand for a period of ninety (90) days. If at the end of the ninety (90) day period neither party has questioned the rate established for the new job classification, it shall become the established rate for the job and shall be treated as any other part of the wage scale. The

---

1. The ALJ was of the opinion that requiring reinstatement of the Company's proposal would be an appropriate remedy but concluded that there was no direct authority under the decisions of the NLRB for such a remedial order.

establishment of such rates will be a matter for negotiation.

A Job Evaluation Committee comprised of the appropriate Plant Manager, Industrial Relations Representative, Chapel Chairman, steward or employee representative(s) shall meet to resolve wage rate issues arising from the installation of new equipment, modifications in existing equipment or changes in job duties having significant effect on employee skill, effort, responsibility, or working conditions requirements.

Should an employee claim that his or her duties have been significantly changed he or she will present the matter to his or her supervisor and steward who in turn shall present the issue to the Job Evaluation Committee. In the event the Committee determines that the duties have changed, it will set a new wage rate.

If the parties are unable to reach an agreement, the rate as established shall stand until termination of the Agreement. Should negotiations result in an increased rate, such increase shall be retroactive to the date of establishment of such rate.

## AMENDMENT

### Article XXVII

This Agreement is complete in writing and excludes all matters from further negotiations for the duration of this Agreement, whether or not previously mentioned, and except as specifically provided to the contrary herein. Further, this Agreement shall not be amended, changed, altered, or qualified, except by an instrument in writing duly signed by the parties signatory hereto.

This Agreement cancels and supersedes any and all previous Agreements, whether written or oral.

During the negotiations of the labor agreement for February 15, 1979 through February 15, 1981, the parties were unable to agree on wage rate adjustments for certain jobs under Article XXIII. Concerned that this disagreement would prevent time-

ly acceptance of the labor agreement, the parties discussed the possibility of resolving this issue after ratification of the labor agreement.

Company representative John Rottler told the Union that after ratification of the collective-bargaining agreement the Company would further discuss the possibility of wage rate increases for certain jobs under Article XXIII. Union President Ralph Meers testified that he informed Rottler that the Union needed a written commitment from the Company to "sit down after negotiations and make the job adjustments." Rottler testified that he told Meers that the Company could not promise a wage rate increase but would agree to further discuss the unresolved Article XXIII matters after ratification of the labor agreement.

The parties subsequently entered into a written agreement entitled "General Understandings not to be placed in Labor Agreement" whereby the Company agreed to take certain actions following the ratification of the labor agreement. Paragraph 4 of this collateral agreement provides as follows:

4. The Company agrees to meet within 60 days of the ratification date to discuss as Article XXIII's the following jobs:

108 Flexo Operator I
109 Flexo Operator II
110 Assistant Flexo Operator
152 Adhesive Maker
302 Senior Press Operator
342 Third Press Operator
350 Web Cutting Helper-Zerand
363 Take Off (case turning)
404 Lift Operator Clerk "B" in Plant I finishing, Containers, and outlying warehouses 405 Local and Shuttle Driver (Containers)
345 Winder Repiler
303 Cutting Premakeready in Dept. 221
400 Title Change
406 Roll Clamp Operator Clerk B
Maintenance Article XXIII filed in January 1979

This collateral agreement was actually incorporated into the collective-bargaining agreement which was ratified by the Union in February 1979.

Shortly after the ratification of the collective-bargaining agreement, the parties resumed their discussion of wage rate adjustments under Article XXIII. Although some wage rate adjustments were made, the parties were unable to agree on wage rate adjustments for certain maintenance job classifications listed in paragraph 4 of the General Understandings. The Company and Union representatives continued to meet on numerous occasions for several months but were still at an impasse on the issue of wage rate adjustments for maintenance employees under Article XXIII.

The Company's position was that it could not offer a wage rate increase for maintenance employees under Article XXIII because there had been no change in the job responsibilities of maintenance employees. The Union, however, asserted that most of the maintenance employees had already acquired new skills and assumed additional responsibilities which justified a wage rate increase under Article XXIII.

On August 7, 1979, the Company presented a written proposal which provided for a wage rate increase for maintenance employees on the condition that these employees would undergo training to acquire new skills in areas outside their present job classification. A representative of the Company stated that the offer would be withdrawn if not accepted within ten days. Union President Ralph Meers wrote a letter to Operations Manager Charles Maynard on August 14, 1979, requesting that a meeting previously scheduled for August 27, 1979 include a discussion of all remaining issues under Article XXIII. On August 15, 1979, Union officials submitted a counter-offer to the Company's proposal of August 7, 1979. Meers wrote Maynard on August 20, 1979, stating that the Union would file a grievance and arbitrate "the failure of the Company to adjust the job rates" if an agreement on wage rate adjustments under Article XXIII could not be reached.

At the August 27, 1979 meeting, the Company submitted an amendment to its proposal which stated that the intent of the proposal was not to "make mechanics out of [electricians and electronic technicians] . . . but merely to be able to require them to do mechanic work related to their electrical work . . . should an emergency situation arise." During the meeting, the parties discussed the possibility of wage rate adjustments for various job categories under Article XXIII but were unable to agree on wage rate adjustments for maintenance employees. The Company representative announced that the Company's amended proposal would be reinstated for 48 hours after which time it would be withdrawn if not accepted.

The testimony is conflicting as to whether the Union was actually bound by the 48-hour deadline. Union president Meers testified that he vehemently objected to the time limit on the Company's offer at the August 27, 1979 meeting, and looked at Maynard "in almost disbelief" and said: "You can't be serious about this? This gives us until Wednesday. There is no way that the union can respond to this proposal in this short of a time." Meers further testified that he advised Maynard at the August 27, 1979 meeting that there were three shifts in the maintenance department, that the following Monday was a holiday, and that the earliest date that the Union membership could meet was September 9, 1979. According to Meers, Maynard replied that the Union was not bound by the 48-hour time limit but that the Company simply did not want the issue to remain unresolved for another six months to a year. Meers testified that he told Maynard that the Union agreed with the Company's view that the matter had to be resolved as soon as possible.

Company representative Maynard, however, testified that "to the best of his recollection" Meers did not object to the 48-hour deadline on the Company proposal at the August 27, 1979 meeting but rather expressed agreement that a time limit was necessary. Maynard also denied that Meers

asserted that it was impossible to meet with the Union membership on such short notice. Maynard further testified that Meers indicated that acceptance of the proposal was unlikely.

The parties met again on August 31, 1979 at which time Meers presented a request for arbitration of all unresolved matters under paragraph 4 of the General Understandings. In addition, Meers requested an extension of the time limit for acceptance of the Company's August 27, 1979 proposal. Meers testified that he told Maynard that he had received favorable comments from the maintenance employees, indicating that the Union membership would probably accept the Company's proposal at their next meeting on September 9, 1979. According to Meers, Maynard suggested that the request be put in writing and did not indicate that the offer had been withdrawn.

On the same day, August 31, 1979, Meers sent Maynard the following letter:

> Please be advised that because of encouraging reports I have received, I would like to request that the Company extend the last Maintenance Offer until Monday, 12 Midnight, September 17, 1979, at which time the offer becomes void if not approved.
>
> Please advise me as to your position.

Meers testified that the letter was written pursuant to Maynard's request that Meers put in writing his statement that he had received encouraging reports from the Union membership concerning the Company's proposal. Meers further stated that although the Union meeting was scheduled for September 9, 1979, he requested an extension until September 17, 1979 as a precaution in the event of an unexpected delay in accepting the Company's proposal. Maynard testified that it was during the August 31, 1979 meeting rather than the August 27, 1979 meeting, that Meers protested the imposition of a 48-hour deadline on the Company's proposal. Maynard further stated that he indicated to Meers at the August 31, 1979 meeting that the Company was serious about the time limit and that the deadline had already passed. According to Maynard,

Meers stated that it would be "helpful" if the Company would extend the deadline. Maynard testified that he suggested to Meers to put the request in writing and that it would be taken under advisement.

In a letter dated September 7, 1979, Maynard informed Meers that "[s]ince the Union did not accept the proposal or ask for an extension within 48 hours, the maintenance proposal is therefore withdrawn from further consideration." Maynard testified that the proposal was withdrawn because the parties had been discussing the matter for several months and the grievances concerning this issue were causing "problems" at the plant. On September 9, 1979, prior to receipt of Maynard's letter denying the Union's request for an extension of time, Meers met with the maintenance employees and obtained approval of the Company's offer. Meers received Maynard's letter on September 10, 1979 and questioned Maynard about the denial of the Union's request for an extension of time the following day. Maynard indicated that it was "out of [his] control" and suggested that Meers contact Bob Sparrow, Company Vice President of Human Resources and Development. In response to Meers' inquiry, Sparrow stated that the Company would reinstate the proposal of August 27, 1979 if the Union would withdraw its request for arbitration of all other unresolved matters under paragraph 4 of the General Understandings. Meers refused to agree to this condition.

Rejecting the Company's initial argument that the Union had waived its right to demand bargaining over wage rates under Article XXIII during the term of the collective-bargaining agreement, the ALJ reviewed the facts allegedly constituting a refusal to bargain in good faith. The ALJ found that the evidence did not support the Company's assertion that the offer automatically expired 48 hours after the August 27, 1979 meeting. Rather, the ALJ credited Meers' account of the August 27, 1979 meeting and found that the Union was not bound by the 48-hour time limit. Accordingly, the ALJ found that the offer was still effective when the Union notified the Com-

pany on August 31, 1979 that the Union membership would probably accept the offer at their next meeting. The ALJ further determined that the evidence established that the Company withdrew its offer on September 7, 1979, shortly before the Union membership voted to accept the proposal on September 9, 1979, and that upon further protest by the Union, the Company only agreed to reinstate the offer on the condition that the Union would withdraw its demand for arbitration on all other matters. Based upon the foregoing findings of fact, the ALJ concluded that the Company violated Sections 8(a)(1) and (5) of the Act by refusing to bargain in good faith with the Union.

■ The Company first argues that pursuant to Section 8(d) of the Act it was not under a duty to bargain over wage rates during the term of the collective-bargaining agreement because the collective-bargaining agreement established wage rates. The Company also contends that Articles XXIII and XXVII of the agreement read together constitute a waiver of the Union's right to demand mid-term bargaining over wage rates. According to the Company, Article XXIII merely provides a grievance procedure for disputes over wage rates for new or changed jobs but does not obligate the Company to bargain over such matters during the term of the labor agreement.

Section 8(d) of the Act provides in pertinent part as follows:

> ... and the duty so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract ...

29 U.S.C. § 158(d). Thus, Section 8(d) of the Act relieves the parties of the duty during the term of a labor agreement to bargain over subjects that are specifically included in the terms and conditions of the contract. *NL Indus., Inc. v. NLRB,* 536

F.2d 786, 787 (8th Cir.1976); *NLRB v. Jacobs Mfg. Co.,* 196 F.2d 680, 684 (2d Cir. 1952). Conversely, even if the parties have thoroughly reviewed a particular matter during contract negotiations, the right to demand bargaining over a matter during the term of the contract has not been relinquished unless the matter is specifically covered by the contract or a waiver of the right to demand mid-term bargaining over the matter has been clearly manifested. *Communication Workers of America AFL-CIO, Local 1051 v. NLRB,* 644 F.2d 923, 927 (1st Cir.1981); *NL Indus., Inc. v. NLRB, supra* at 790; *NLRB v. Taylor,* 338 F.2d 1003, 1004 (5th Cir.1964); *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746, 751 (6th Cir.1963).

■ The Company correctly notes that the labor agreement established general wage rates. However, the contract also provided for bargaining over wage rate adjustments for new or changed jobs under Article XXIII during the term of the contract. Because the parties were unable to reach an agreement on the appropriateness of certain wage rate adjustments under Article XXIII, the Union demanded a written commitment from the Company, prior to executing the contract, to further negotiate and "make" appropriate wage rate adjustments for certain jobs under Article XXIII after ratification of the contract. Consequently, although the Union may have relinquished its right to demand mid-term bargaining for a general wage increase for all job classifications by executing the contract, it certainly did not waive its right under Article XXIII to demand mid-term bargaining over wage rate adjustments for new or changed jobs. On the contrary, the Union took careful steps to preserve its right to demand mid-term bargaining over Article XXIII matters by requiring a written commitment from the Company prior to ratification of the contract.

■ The Company's assertion that Article XXIII itself constitutes a waiver of the right to demand mid-term bargaining also is without merit. The Company argues that Article XXIII provides the Company

with unilateral control over wage rate adjustments for new or changed jobs during the term of the contract. According to the Company's construction of Article XXIII, the Company is authorized to summarily reject any mid-term grievance filed by the Union concerning wage rate adjustments under Article XXIII. In support of this contention the Company cites the following language from Article XXIII:

If the parties are unable to reach an agreement, the rate as established shall stand until termination of the Agreement. Should negotiations result in an increased rate, such increase shall be retroactive to the date of establishment of such rate.

The Court fails to see the logic in this argument. By providing that wage rates under the collective-bargaining agreement shall remain in effect if the parties are unable to agree on mid-term wage rate adjustments under Article XXIII, the parties obviously did not intend to waive the right to demand mid-term bargaining over matters under Article XXIII. Rather, this provision simply applies if the parties have bargained in good faith but nevertheless are still at an impasse over matters under Article XXIII. Read as a whole, Article XXIII clearly expresses the parties' intent that they engage in good faith "negotiations" over wage rates for new or changed jobs during the term of the contract.

Furthermore, the Company's reliance on Article XXVII is misplaced. Article XXVII states that all matters are excluded from further negotiations during the term of the contract unless otherwise provided under the terms of the contract. As previously discussed, Article XXIII expressly reaffirms the parties' right to demand mid-term bargaining over Article XXIII matters and, therefore, falls within the exception to Article XXVII.

The Company next argues that even assuming it had a duty to bargain over Article XXIII matters during the term of the contract, the Company did not refuse to bargain in good faith in violation of Sections 8(a)(1) and (5) of the Act. In support of its position, the Company notes that after several months of negotiating over wage rate adjustments under Article XXIII, the Company set forth a proposal with a 10-day time limit on acceptance which was rejected by the Union. Upon reinstatement of the proposal on August 27, 1979, the Company asserts that it imposed a 48-hour time limit on acceptance because the proposal was virtually identical to the previous proposal that had been rejected by the Union. The Company, therefore, claims that upon the expiration of the 48-hour time limit, the proposal was automatically withdrawn. Under these circumstances, the Company contends that its refusal to unconditionally reinstate the proposal after the 48-hour period had elapsed did not constitute a refusal to bargain in good faith in violation of Sections 8(a)(1) and (5) of the Act.

The Company essentially challenges the ALJ's credibility determinations. The ALJ found that at the August 27, 1979 meeting, after Union President Meers protested the imposition of a 48-hour deadline on acceptance of the Company's proposal, Company representative Maynard indicated that the Union was not bound by the 48-hour deadline but rather that the Company merely wanted to resolve this matter as soon as possible. Consequently, the ALJ found that the August 27, 1979 proposal did not expire automatically but was still effective on August 31, 1979 when Meers requested an extension of time and notified the Company that the offer would probably be accepted by the Union membership at their next meeting on September 9, 1979. The ALJ further found that the Company withdrew the offer on September 7, 1979 knowing acceptance by the Union was imminent and, upon actual acceptance and further protest by the Union, only offered to reinstate the proposal on the condition that the Union withdraw its demand for arbitration on all other matters.

Our review of the Board's findings of fact is limited to a determination of whether they are supported by substantial evidence. 29 U.S.C. § 160(a); *NLRB v.*

E–Systems, Inc., 642 F.2d 118, 119–20 (5th Cir.1981); TRW–United Greenfield Div. v. NLRB, 637 F.2d 410, 416 (5th Cir.1981); Central Freight Lines, Inc. v. NLRB, 624 F.2d 1301, 1302 (5th Cir.1980). It is not our function to reweigh the evidence or make credibility choices. NLRB v. E–Systems, Inc., supra at 119–20; NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 843 (5th Cir.1977). If the evidence is conflicting and the decision of the NLRB rests on credibility, then we are bound by the credibility determinations of the Board unless they are inherently unreasonable or self-contradictory. NLRB v. E–Systems, Inc., supra at 120; NLRB v. Moore Business Forms, Inc., supra at 843; NLRB v. Standard Forge and Axle Co., Inc., 420 F.2d 508, 509–10 (5th Cir.1969); Nabors v. NLRB, 323 F.2d 686, 692 (5th Cir.1963).

In determining whether an employer has violated Section 8(a) of the Act, the employer's conduct must be considered in light of all of the circumstances. NLRB v. Randle-Eastern Ambulance Service, Inc., 584 F.2d 720, 725 (5th Cir.1970). The withdrawal of previous proposals or tentative agreements does not in and of itself establish the absence of good faith. NLRB v. Randle-Eastern Ambulance Service, Inc., supra at 725. However, withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer in violation of Section 8(a)(5) of the Act where the proposal has been tentatively agreed upon or acceptance by the Union appears to be imminent. NLRB v. F. Strauss & Son, Inc., 536 F.2d 60, 64 (5th Cir.1976); American Seating Co. of Mississippi v. NLRB, 424 F.2d 106, 108 (5th Cir.1970); NLRB v. A.W. Thompson, Inc., 449 F.2d 1333, 1335 (5th Cir.1971); Ramona's Mexican Food Products, Inc., 203 NLRB 663, 684 (1973), enf'd, 531 F.2d 390 (9th Cir.1975).

In resolving the conflicting testimony, the ALJ thoroughly analyzed the evidence and specifically set forth in a well-reasoned opinion the bases for his credibility determinations. The ALJ's decision to credit Meers' account of the meetings on August 27 and August 31, 1979 was based on a number of factors, including the fact that Meers' testimony was detailed and specific, while Maynard's testimony was vague and general. The credibility determinations of the ALJ are clearly based upon sound reasoning and accordingly will not be disturbed. The Court concludes that there is substantial evidence in the record to support the Board's finding that the Company violated Sections 8(a)(1) and (5) of the Act by withdrawing its proposal without good cause knowing that acceptance by the Union was imminent and only offering to reinstate the proposal on the condition that the Union withdraw its request for arbitration of all other unresolved matters.

Finally, the Company argues that even if it violated Sections 8(a)(1) and (5) of the Act by refusing to bargain in good faith, the Board's remedial order requiring the Company to reinstate its August 27, 1979 proposal was improper because it compels an agreement between the parties. The Company further asserts that, in any event, the August 27, 1979 proposal is outdated since there have been subsequent changes in job responsibilities. The Company, therefore, contends that the remedy should be merely an order to bargain upon request so the parties will be able to consider any changes in job responsibilities since the proposal was first presented.

Section 10(c) of the Act authorizes the NLRB to devise remedies to effectuate the policies of the Act. Because of its special expertise, the Board is afforded broad discretion in formulating remedies that will further the purposes of the Act. NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547, 577 n. 32 (1969); Fibreboard Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233, 241 (1964). Accordingly, judicial review of the Board's remedial orders is very limited. The remedial orders of the NLRB will be enforced "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the act." Fibreboard Corp. v.

NLRB, supra at 216, 85 S.Ct. at 405 (quoting Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568, 1574 (1943)). In devising a remedy, the Board should attempt to "both compensate the party wronged and withhold from the wrongdoer the 'fruits of its violation'." *International Union of Electrical, Radio and Machine Workers v. NLRB,* 426 F.2d 1243, 1249 (D.C.Cir.1970), *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970) (citing *Montgomery Ward & Co. v. NLRB,* 339 F.2d 889, 894 (6th Cir.1965)).

 In support of its contention that the remedial order is improper because it compels an agreement, the Company cites *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). However, *H.K. Porter Co.* is clearly distinguishable from the case at bar. In *H.K. Porter Co.,* the Board entered a remedial order "requiring the Company to agree to check off the [Union] dues of the workers." *H.K. Porter Co. v. NLRB, supra* at 102, 90 S.Ct. at 822. The Supreme Court held that "while the Board does have power . . . to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of the collective-bargaining agreement." *Id.* Unlike the remedial order in *H.K. Porter Co.,* the remedial order in the case at bar does not compel an agreement but rather merely requires the Company to reinstate a proposal it previously voluntarily presented during negotiations and subsequently withdrew in violation of the Act.[2]

The Board concluded that simply ordering the Company to bargain in good faith, without more, would permit the Company to continue to withhold from further consideration the proposal it unlawfully withdrew. By requiring the Company to reinstate the August 27, 1979 proposal for 20 consecutive days, the Board was able to restore the status quo without imposing an undue burden upon the Company. The Court concludes that such a remedial order fully and fairly effectuates the policies of the Act. Accordingly, the Court will enforce the Board's order.

### Interference with Employees' Right to Engage in Union Activities

David Dunn, a mechanic and union shop steward during the spring of 1979, filed a number of grievances during that period. Dunn testified that on April 15, 1979, Maintenance Foreman Rod Jordan told him that he was not the first person at the plant who thought he was a "hot dog organizer." According to Dunn, Jordan stated that "there had been others, and that they were no longer with the Company", noting that a prior union shop steward named Fennel "thought he had the people behind him, and the Company got rid of him." Dunn further testified that in a second conversation that day, Jordan stated that "he didn't understand why [Dunn] was pushing so hard on this issue concerning the Maintenance Department, that the people wouldn't back [Dunn], that they would run [Dunn] out on a limb and the limb would be cut off." Dunn stated that he felt threatened by Jordan's statements.

Jordan testified that he had two conversations with Dunn about union matters but only vaguely recalled the substance of the conversations. According to Jordan, he told Dunn that it had been difficult in the past to "get the shop together" because the older and younger employees often could not agree. He further testified that he may have mentioned that Fennel was no longer with the Company. Finally, with respect to the second conversation, Jordan essentially testified that he did not recall telling Dunn that he was out on a limb that was going to be cut off. Noting that Jordan's testimony of the conversations was vague but partially corroborative of Dunn's testimony, the

**2.** The remedial order in the case at bar is analogous to cases in which the Board has ordered a party to execute a contract which had previously been agreed upon by the parties. *NLRB v. Raven Indus. Inc.,* 508 F.2d 1289, 1291–92 (8th Cir.1974); *NLRB v. Central Machine & Tool Co., Inc.,* 424 F.2d 1127, 1129 (10th Cir. 1970); *Retail Clerks Int'l Asso. v. NLRB,* 373 F.2d 655, 660 (D.C.Cir.1967).

ALJ credited Dunn's account of the conversations.

Employee John C. Lee, a union steward and member of the grievance committee, filed 20 to 25 grievances in 1979. Lee testified that in mid-June of 1979, Manufacturing Manager Bobby Bullock said to him: "J.C., you are going to have to stop filing these grievances because these people can really make it hard for you. They can fix it so you cannot get any credit. You can't buy a car, you won't be able to buy a home." Lee further testified that upon asking Bullock who he was talking about, Bullock replied "You know, Mead Packaging [has] got a lot of money."

Bullock testified that he often had conversations with Lee concerning union-management relations because Lee was on the grievance committee but that he never threatened Lee. In light of Lee's detailed and explicit testimony as opposed to Bullock's general denial, the ALJ credited Lee's testimony concerning this conversation.

Cleveland Jones, a member of the grievance committee, testified that on June 18, 1979 Bullock talked to him about a grievance filed by John C. Lee and John Johnson. According to Jones, Bullock said that Jones was "going to get somewhere" but that some of the other stewards, in particular John C. Lee and John Johnson, were "not going to get anywhere" because they were "steering [sic] up a whole lot of trouble" by filing grievances. Jones further testified that Bullock asked him why Lee was on the grievance committee and that Jones replied that the employees had voted for Lee. Finally, Jones stated that Bullock told him that the Company was going to grant the grievance filed by Lee and Johnson.

Bullock denied discussing union grievances with Jones except during meetings between the Union and management, and further denied saying to Jones that Lee and Johnson were causing trouble by filing grievances. Bullock also testified that he mentioned to Jones that he had management potential but denied telling Jones that Lee and Johnson would not be promoted because of their union activities. The ALJ credited Jones' account of this conversation based upon a number of reasons, including the fact that Bullock did not deny asking Jones why Lee was a member of the grievance committee.

Union Steward David Dunn stated that it was a customary practice at the Company plant to write grievances during working hours. In mid-July of 1979, Dunn was writing a grievance during working hours when, according to Dunn, Engineering and Maintenance Manager James Weldon told him that he could no longer write grievances on Company time. Dunn testified that he had another conversation with Weldon in which he was told that when a machine malfunctioned, the writing of a grievance concerning the assignment to repair the machine would have to wait until the machine was repaired because other employees would not be able to work when a machine was not functioning. However, Dunn indicated that at the time of the first conversation with Weldon all of the machines were functioning properly.

Weldon testified that the Company did not have a policy concerning the time for writing grievances, except that grievances could not be written when a machine needed to be repaired. According to Weldon, his conversation with Dunn concerned a machinist who had been assigned to repair a machine but wanted to write a grievance before completing the repairs. Weldon denied saying that grievances could not be written during working hours and testified that he only told Dunn that the repairs would have to be made before time could be taken to write a grievance.

The ALJ noted that Weldon's testimony only referred to the second conversation with Dunn during which time a machine needed repairs and that Weldon did not deny or even mention having the first conversation with Dunn. Accordingly, the ALJ credited Dunn's testimony concerning the first conversation.

David Dunn also testified that in late July of 1979 he told Maintenance Superintendent Ed Hankins that Weldon seemed

unfriendly and no longer talked to him. According to Dunn, Hankins replied that Dunn may have upset Weldon and suggested that Dunn apologize. Dunn testified that he told Hankins that he saw no reason to apologize because he had done nothing to upset Weldon and that Hankins then stated that "this thing wasn't over yet and before it was, [Dunn] probably would be sorry."

Hankins denied having any conversation with Dunn in which he mentioned that Weldon was unhappy with Dunn or suggested that Dunn should apologize to Weldon. Crediting Dunn's account of the conversation, the ALJ noted that although Hankins denied certain parts of the conversation alleged by Dunn, he did not deny telling Dunn that "it wasn't over yet" and that Dunn "probably would be sorry."

Based upon these findings of fact, the ALJ found that the Company had committed unfair labor practices in violation of Section 8(a)(1) of the Act by threatening employees for filing grievances and engaging in union activities; interrogating an employee about the reasons for the selection of another employee as a member of the grievance committee; and promulgating new rules governing the processing of grievances contrary to prior practice. Because a substantial amount of conflicting testimony was presented on this issue, the ALJ's findings are based primarily upon credibility determinations. The Company merely argues that the Board erred in its credibility decisions. As previously discussed, however, we are bound by the credibility choices of the NLRB unless they are clearly unreasonable. *NLRB v. E–Systems, Inc., supra* at 120; *NLRB v. Moore Business Forms, Inc., supra* at 843; *NLRB v. Standard Forge and Axle Co., Inc., supra* at 510.

Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of their right to engage in union activities. Under this Section, the issue to be determined is whether the employer's questions, threats or statements tended to be coercive, not whether the employees were in fact coerced. *TRW–United Greenfield Div. v. NLRB,* supra at 415; *Sturgis Newport Business, Inc. v. NLRB,* 563 F.2d 1252, 1256 (5th Cir.1977); *NLRB v. Huntsville Mfg. Co.,* 514 F.2d 723, 724 (5th Cir.1975). In making this determination, the employer's conduct must be considered in light of all of the surrounding facts and circumstances. *TRW–United Greenfield Div. v. NLRB, supra* at 416.

A violation of Section 8(a)(1) of the Act has clearly occurred when an employer has threatened employees with a discharge, demotion or other reprisals for engaging in union activities. *Delchamps, Inc. v. NLRB,* 585 F.2d 91, 93 (5th Cir.1978); *NLRB v. Pope Maintenance Corp.,* 573 F.2d 898, 905 (5th Cir.1978); *NLRB v. Kaiser Agricultural Chemicals, Div. of Kaiser A. & C. Corp.,* 473 F.2d 374, 380–81 (5th Cir. 1973). It need only be shown that, under the totality of the circumstances, "the employees could reasonably conclude that the employer is threatening economic reprisals if they support the Union." *TRW-United Greenfield Div. v. NLRB, supra* at 418 (quoting *Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 105 (5th Cir.1963)).

An employer with a legitimate reason may question employees concerning union matters without violating Section 8(a)(1) of the Act. However, an interrogation in which the "words themselves or the context in which they are used ... suggest an element of coercion or interference" is unlawful. *Delco-Remy Div., General Motors Corp. v. NLRB,* 596 F.2d 1295, 1309 (5th Cir.1979).

There has been no showing that the ALJ's credibility choices were unreasonable. On the contrary, it appears that the credibility determinations of the ALJ were well-founded. Consequently, the Court is bound by those determinations.

It is clear that several of the statements made by management personnel threatened employees with economic reprisals for engaging in union activities. The Court, therefore, concludes that there is substantial evidence in the record to sup-

port the Board's finding that, in light of all of the circumstances, the various statements made by the management personnel tended to be coercive and interfered with the employees' right to engage in union activities in violation of Section 8(a)(1) of the Act.

Accordingly, the order of the Board is hereby ENFORCED in its entirety.