208 F.3d 362 (2nd Cir. 2000)
 TNT USA INC., Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
LOCAL 851, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, Intervenor.
 Docket Nos. 99-4124(L), 99-4152(XAP)
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 13, 2000
Decided: March 27, 2000
 
 Petition for review of an order of the National Labor Relations Board finding that petitioner bargained with intervenor in bad faith on August 27, 1993, and ordering petitioner (1) to reinstate its proposal for a collective-bargaining agreement as it stood prior to its withdrawal in bad faith; (2) to sign an agreement, if the reinstated proposal is accepted by intervenor; and (3) to give the agreement retroactive effect from the date that the parties would have signed an agreement absent bad faith.
 Affirmed.
 HERBERT MEYER, Jeffrey W. Pagano, King, Pagano & Harrison, New York, N.Y., for Petitioner-Cross-Respondent.
 JULIE B. BROIDO (Leonard R. Page, General Counsel; Linda Sher, Associate General Counsel Aileen A. Armstrong, Deputy Associate General Counsel; and Charles Donnelly, Supervisory Attorney, of counsel), Washington, D.C., for Respondent-Cross-Petitioner.
 SUSAN JENNIK, Kennedy, Schwartz & Cure, P.C., New York, N.Y., for Intervenor.
 Before: CARDAMONE, AND CABRANES, Circuit Judges, and TRAGER, District Judge.*
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 TNT USA, Inc. ("TNT"), formerly TNT Skypack, petitions for review of an order of the National Labor Relations Board ("NLRB"), issued on May 24, 1999, finding that TNT bargained in bad faith on August 27, 1993, and ordering it (1) to reinstate its proposal for a collective-bargaining agreement as it stood prior to being withdrawn in bad faith; (2) to sign an agreement, if the reinstated proposal is accepted by intervenor Local 851, International Brotherhood of Teamsters ("the Union"); and (3) to give the agreement retroactive effect from the date that the parties would have signed an agreement absent bad faith. For the reasons stated below, we affirm the order of the NLRB.
 
 I.
 
 2
 TNT is part of the United States operation of TNT Worldwide, a corporation in the business of providing worldwide courier services. Until December 1997, TNT operated a facility in Long Island City, New York. On October 1, 1991, the Union was certified as the exclusive collective-bargaining representative of all full-time and regular part-time employees of the Long Island City facility. Negotiations for a collective-bargaining agreement began on October 31, 1991 with the Union's submission of its initial proposal. The negotiations progressed and the parties reached tentative agreements on a number of substantive issues. On June 29, 1993, TNT attorney Clifford P. Chaiet sent a letter to the Union, at the Union's request, outlining TNT's position on the issues that remained open.[1] By letter dated July 20, 1993, Chaiet asked Robert Archer, the Union's attorney, to prepare an updated draft of the agreement for his review. The Union forwarded its "revised Collective Bargaining Agreement" ("revised CBA") to Chaiet on August 2, 1993. The revised CBA adopted most of TNT's language concerning three of the four issues identified by the company as open and included other proposed changes to the language. The Union, however, rejected TNT's proposal for a more extensive use of, and lower starting wages for, "walkers." All of the changes proposed by the Union in the revised CBA were in boldface and underlined for ease of reference.
 
 
 3
 On August 27, 1993, Chaiet wrote to the Union announcing that TNT had reassessed its position regarding the negotiations. Attached to the letter was a summary of the company's position as it stood after its "reassessment." The Union alleged that TNT's latest position reneged on a number of substantive issues already agreed upon, and accused the company of engaging in unfair labor practices. Pointing to a petition by a number of the company's employees stating their desire no longer to be represented by the Union, TNT subsequently declined further offers to negotiate with the Union "until the issue of Local 851's status as representative of TNT's Long Island City drives is resolved."
 
 
 4
 Between December 1993 and September 1994, the Union filed a number of unfair labor practice charges against TNT with the NLRB. Pursuant to these charges, the NLRB's Regional Director issued a series of complaints. The Regional Director alleged that the company had violated 158(a)(5) ("Section 8(a)(5)") of the National Labor Relations Act, 29 U.S.C. 151 et seq. ("NLRA"), by withdrawing agreements previously made during the negotiations. The Regional Director also alleged that TNT violated 158(a)(1) ("Section 8(a)(1)") of the NLRA by withdrawing recognition of the Union as the sole collective-bargaining agent of its employees. On September 8, 1995, after a hearing, an administrative law judge ("ALJ") concluded that TNT's conduct violated section 8(a)(1) and (5). The ALJ found that the a Union had "throw[n] in the towel" during the negotiations, accepting virtually all of the company's positions. Based on this finding, the ALJ determined that TNT had unlawfully reneged on previous tentative agreements in order to avoid the signing of a contract that, because of the Union's virtual capitulation, appeared inevitable. The ALJ thus ordered TNT to reinstate the company's proposals as they stood prior to their retraction in bad faith on August 27, 1993.
 
 
 5
 On May 24, 1999, the NLRB issued a decision agreeing with the ALJ's determination but amending the recommended order to reflect two agreements reached between TNT and the Union after resuming negotiations in 1995.[2] TNT now petitions for review of the decision of the NLRB, claiming that (1) the record does not support the NLRB's finding of bad faith, and (2) the remedial order exceeded the authority granted to the NLRB under the NLRA. The NLRB has filed a cross-application for enforcement of the order.
 
 II.
 A. The NRLB's Determination of Bad Faith
 
 6
 In reviewing a decision of the NLRB, "the test we apply is not whether we might make a different choice between inferences were the matter before us de novo, but whether there is substantial evidence on the record as a whole to support the Board's finding." Abbey's Transp. Servs., Inc. v. NLRB, 837 F.2d 575, 579 (2d Cir. 1988); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).
 
 
 7
 The NLRB based its determination that TNT bargained in bad faith on two findings drawn from the record. First, the NLRB agreed with the ALJ's findings that the Union had thrown in the towel during the negotiations by accepting virtually all of TNT's proposals. Second, it found that the ALJ reasonably inferred that, but for TNT's allegedly unlawful conduct-its bad faith actions to frustrate the signing of a contract-an agreement would have been reached on August 27, 1993. Relying on these findings, the NLRB concluded, as had the ALJ, that TNT had violated the NLRA by withdrawing its proposal in order to avoid reaching an agreement with the Union.
 
 
 8
 TNT argues that the NLRB's findings are little more than conjecture which cannot support a finding of bad faith. It points to the Union's revised CBA of August 2, 1993, highlighting twenty-six items to which the Union allegedly had not agreed. Of these, TNT argues, many were sufficiently substantial to undermine the contention that the Union had thrown in the towel. In addition, in light of the nature of the issues it claims were still open, TNT maintains that, at the time of the alleged bad faith, any agreement with the Union was "uncertain and far distant."
 
 
 9
 We conclude that the NLRB's determination that TNT bargained in bad faith is supported by substantial evidence. First, the record supports the finding that the Union effectively threw in the towel during its negotiations with TNT. In its letter of June 29, 1993, TNT outlined the four issues it saw as outstanding. Of the four presented, the Union readily adopted the company's position on three. The Union did reject TNT's proposal concerning the use of walkers, but in the view of the ALJ this issue had little significance and was being used primarily as a means to delay the negotiations. This determination is supported by the record because TNT had at most only one employee who might have been classified as a walker. Moreover, no evidence was presented to show that TNT intended to hire more employees as walkers in the future.
 
 
 10
 TNT's assertion that there were twenty-six issues still unresolved by the parties is artful. This figure was derived from the underscoring in the Union's August 2, 1993 revised CBA. However, not all of the underscored language in the revised CBA indicates an issue that had yet to be resolved. Rather, most of the underscored passages constitute the Union's language accepting TNT's proposals. Although the Union made a small number of counter offers, we are satisfied with the ALJ's determination that these were minor and merely an attempt by the Union to save face. Therefore, in light of the Union's acceptance of virtually all of TNT's demands, the NLRB reasonably found that the Union was throwing in the towel in order to obtain an agreement.
 
 
 11
 In addition to the Union's acquiescence during the negotiations, TNT's repudiation of the earlier tentative agreements at the same time the Union was capitulating supports the NLRB's conclusion that an agreement was otherwise imminent. TNT withdrew from most of the major tentative agreements-the result of over two years of negotiations-shortly after the Union presented its August 2, 1993 revised CBA. The company explained this turnabout to the ALJ as the result of "ongoing adverse economic conditions" and "changes in management personnel." However, the company's economic condition had been declining since mid-1992 and, as noted by the ALJ, "nothing was said to the Union . . . which even hinted that the numerous tentative agreements that had been forged during the preceding 18 months were in jeopardy or were being reconsidered."
 
 
 12
 Further, TNT makes no attempt to explain why the change in the company's situation necessitated the withdrawal from the tentative agreements already reached by the parties. Moreover, it does not explain why this reversal was required at a time the Union was acceding to virtually all of the company's demands. As the ALJ noted, "the only significant new event occurring prior to Chaiet's August 27 letter, was that there was, from [TNT's] point of view, a danger that the Union would make sufficient concessions so that agreement on a contract would become inevitable." In light of the evidence that the Union was throwing in the towel and TNT's unexplained repudiation of most tentative agreements at the time of the Union's acquiescence, the record supports the NLRB's determination that a full agreement was imminent and that TNT's reversal was intended to prevent any such agreement from becoming finalized. Accordingly, we affirm the NLRB's conclusion that TNT bargained in bad faith. See Mead Corp. v. NLRB, 697 F.2d 1013, 1022 (11th Cir. 1983) ("[W]ithdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer in violation of Section 8(a)(5) of the [NLRA] where the proposal has been tentatively agreed upon or acceptance by the Union appears to be imminent."); cf. Abbey's Transp. Servs., 837 F.2d at 580 (stating that "[t]he abruptness of the discharges and their timing are 'persuasive evidence'" of an employer's unlawful motive in employee discharges).
 
 B. The NLRB's Remedial Order
 
 13
 The NLRB's power to issue remedial orders "is a broad discretionary one, subject to limited judicial review." NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc., 134 F.3d 50, 53 (2d Cir. 1997) (internal quotation marks omitted). "In fashioning its remedies under the broad provisions of 10(c) of the [NLRA], the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32 (1969). Accordingly, a remedial order of the Board "will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA]." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216 (1964) (internal quotation marks omitted).
 
 
 14
 TNT argues that the remedy imposed in this case was beyond the NLRB's power to correct unlawful conduct under the NLRA. It argues that the NLRB exceeded its authority by (1) compelling the company to agree to substantive contractual provisions that were never agreed to; (2) applying the remedy retroactively; (3) and setting the effective date of the agreement as August 27, 1993. While the NLRB has authority to compel enforcement of the terms of a negotiated agreement, TNT argues, it may not compel enforcement of substantive terms that are not contained in that agreement. See H.K. Porter Co. v. NLRB, 397 U.S. 99, 102 (1970) (holding that the NLRB is "without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement.").
 
 
 15
 We hold that the remedy adopted by the NLRB in this case was within the authority delegated to it under the NLRA. First, the NLRB was correct in compelling TNT to reinstate the company's proposal prior to repudiation. TNT's proposal on June 29, 1993 reflects the company's position prior to its reversal on August 27, 1993. The order of the NLRB required only that TNT reinstate its proposal of a collective-bargaining agreement as it stood prior to the unlawful conduct. Thus, the order "does not compel an agreement but rather merely requires the [c]ompany to reinstate a proposal it previously voluntarily presented during negotiations and subsequently withdrew in violation of the [NLRA]." Mead Corp., 697 F.2d at 1023.
 
 
 16
 The retroactive imposition of the contract also was within the remedial powers of the NLRB. Through subsequent negotiations, the parties agreed to two collective-bargaining agreements that spanned from November 1995 to August 1999. These agreements limited the scope of TNT's liability-if indeed the company was ultimately found liable-to the period between the time of the alleged unlawful conduct and November 8, 1995. Thus, the only issue before the NLRB was the effect of the TNT's conduct between August 27, 1993 and November 8, 1995. The failure to make any remedy in this case retroactive would have deprived the Union of the full benefit of the agreement that would have been reached absent the company's misconduct. Cf. East Bay Chevrolet v. NLRB, 659 F.2d 1006, 1010 (9th Cir. 1981) (holding that a retroactive order was proper as it "merely gave the employees the full benefit of the bargain that had already been agreed upon"); see also Franks v. Bowman Transp. Co., 424 U.S. 747, 769 (1976) ("The task of the NLRB in [crafting a remedy] is to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice." (internal quotation marks omitted)). Accordingly, in imposing the remedy retroactively, the NLRB was merely effectuating the policies of the NLRA.
 
 
 17
 Finally, the NLRB did not exceed its authority in setting August 27, 1993 as the effective date of the agreement. The NLRB set this date after determining that August 27, 1993 marked the time when an agreement would have been reached absent TNT's unlawful conduct.[3] Although generally an order of the NLRB "establishing the effective date of [a] contract cannot be enforced as it compels the parties to agree to a substantive term of the contract," East Bay, 659 F.2d at 1011, we conclude that, under the circumstances presented here, it was within the NLRB's authority to establish August 27, 1993 as the effective date of the contract. The contractual language already agreed to by the parties indicates that the agreement would be "in full force and effect from the date of execution." Accordingly, having determined that, absent bad faith, the parties would have reached an agreement by August 27, 1993, it was within the remedial powers of the NLRB-and consistent with the terms to which the parties had already agreed-to establish that date as the effective date of the agreement.
 
 III.
 
 18
 For the reasons stated above, the NLRB's determination that TNT acted in bad faith when it rejected tentative agreements previously agreed to with the Union is supported by substantial evidence. In addition, the remedial order imposed on TNT was within the authority delegated to the NLRB under the NLRA. Accordingly, TNT's petition for review is denied and the NLRB's cross-petition for enforcement of its order is granted.
 
 
 
 Notes:
 
 
 *
 The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.
 
 
 [1]
 Chaiet identified only four such items: the effect of the company's world-wide wage freeze on future wage increases; the use of "walkers" (TNT employees whose responsibility was to "transmit packages received from a company driver to the client's office."); the applicability of the agreement in the event that TNT's operations are transferred to other locations; and whether to allow for further negotiations on the issue of medical insurance.
 
 
 [2]
 In 1995, TNT and the Union engaged in negotiations that resulted in two collective-bargaining agreements. The agreements were made effective from November 8, 1995 through August 31, 1996 and from September 1, 1996 through August 31, 1999. The two entities also reached a "closing agreement" to close the Long Island City facility. Although the parties acknowledged that the Union was not withdrawing the present charges before the NLRB (concerning TNT's unlawful conduct beginning on August 27, 1993), they agreed to limit any financial liability arising out of the case to the time between TNT's alleged conduct on August 27, 1993 and November 8, 1995.
 
 
 [3]
 Although both parties agree that the specific date on which the agreement would be reached is uncertain, it was reasonable for the NLRB to have set August 27, 1993 as the date when the contract would have been agreed to absent TNT's bad faith. The NRLB correctly held that any uncertainty should be resolved against the party found to be acting in bad faith. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." ). In this case, it was the company's unlawful conduct that created the uncertainty as to the date by which an agreement would have been signed. As we have previously noted, where it was the [c]ompany's [unlawful] acts that created the uncertainty as to what terms and conditions of employment would have been agreed, . . . it was within the discretion of the Board to place on the [c]ompany the burden of that uncertainty. The Board's decision to give the [victims of unlawful conduct] the benefit of the doubt is remedial rather than punitive.
 NLRB v. Staten Island Hotel Ltd. Partnership, 101 F.3d 858, 862 (2d Cir. 1996). Accordingly, the NLRB reasonably concluded that an agreement would have been reached by August 27, 1993.