**CHICAGO LOCAL NO. 458–3M, Graphic Communications International Union, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**White Cap, Inc., Intervenor.**

**No. 99–1118.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1999.

Decided March 24, 2000.

Thomas D. Allison, Jr., argued the cause for petitioner. With him on the briefs was N. Elizabeth Reynolds.

Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Supervisory Attorney.

Harry J. Secaras argued the cause for intervenor. With him on the brief was Howard L. Bernstein.

1. The union's further contention that the company violated the Act by refusing to bargain over certain mandatory subjects of bargaining is not properly before the court, and, therefore, we do not address it. The union never raised this issue in its charge, it was not contained in the General Counsel's complaint, and the parties did not litigate the issue before the ALJ, who never addressed it. The issue was first raised by Member Liebman in her separate opinion. *See White Cap, Inc.,*

Before: HENDERSON, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The Chicago Local No. 458–3M, Graphic Communications International Union, AFL–CIO ("union"), appeals the National Labor Relations Board's ("Board") decision that White Cap, Inc. ("company"), did not violate § 8(a)(1), (3), and (5) of the National Labor Relations Act ("Act"). *See* 29 U.S.C. § 158(a)(1), (3), (5) (1994). As a threshold contention, the union maintains that there is no discernible rationale underlying the Board decision because the three separate opinions of the Board members are in conflict. Indeed, there are some expressions of uncertainty in the opinions regarding Board precedent governing the practice of "regressive bargaining." We conclude, however, that there is more agreement than is first apparent and that there is a majority-supported rationale for the decision that we can review. As to the union's other challenges to the Board's decision, we hold that the Board reasonably concluded that the company bargained in good faith when it, with good cause, replaced a proposal with a less favorable proposal; that the company's unilateral implementation of its final offer was justified because a bargaining impasse had been reached; and that the company's lockout of its employees was lawful because it was in support of a legitimate bargaining position.[1]

Accordingly, we deny the petition.

325 N.L.R.B. No. 220, 7–8, 1998 WL 430320 (July 24, 1998). The court has previously held that "[t]he Board may not make findings or order remedies on violations not charged in the ... complaint or litigated in the subsequent hearing." *NLRB v. Blake Constr. Co.,* 663 F.2d 272, 279 (D.C.Cir.1981); *see also Conair Corp. v. NLRB,* 721 F.2d 1355, 1371–72 (D.C.Cir.1983). As the court explained in *Trident Seafoods, Inc. v. NLRB,* 101 F.3d 111 (D.C.Cir.1996), each party "must have a full

## I.

White Cap, Inc., manufactures metal and plastic caps for beverage and food containers in several cities in the United States, including Hazelton, Pennsylvania, Hayward, California, Chicago, Illinois, and Champaign, Illinois. Since about 1970, the union has been the exclusive collective-bargaining representative of thirty-one lithographic production employees in the company's manufacturing facility in Chicago.

In December 1993, the company informed the union that it wanted to implement a new work schedule in the Chicago facility by January 31, 1994, and presented a written proposal setting out the terms. By then, the company had already implemented the new schedule in its Hazelton, Hayward, and Champaign facilities, and it explained to the union that the new work schedule was necessary in order to increase productivity and efficiency. Under the proposed schedule, the employees would work twelve hours per day, three consecutive days per week, whereas under the collective-bargaining agreement then in effect,[2] the employees worked five days per week, on day or night shifts lasting seven-and-a-half hours.[3] This proposal led to a series of negotiating meetings as the parties attempted to reach a new agreement. A major stumbling block to any agreement, however, was the union's insistence on a wage increase and the company's refusal to offer one. Although the company agreed to some of the other demands by the union, the parties never came to an agreement that they could both approve, and the union membership voted down the company's proposal by a wide margin in February 1994.[4] For the next few months, the parties continued to meet and negotiate, focusing on whether a wage increase in some form would be acceptable to both parties.[5] For purposes of this appeal, we focus on the company's proposals of June 13th and September 14th and 22nd.

On June 13, 1994, the company presented a proposal providing for the new work schedule to take effect on July 11, 1994. The proposal included a two percent wage increase effective August 1, 1994, no increase the following year, and a one percent wage increase in the third year. The proposal also provided for a signing bonus in the event the new schedule was implemented on July 11th, but no signing bonus if the schedule was phased in to be imple-

and fair opportunity to litigate the issues to be decided by the agency," and "[w]hen one party utterly fails to raise a significant issue before the ALJ, the record developed with regard to that issue will usually be inadequate to support a substantive finding in its favor." *Id.* at 116. The same rationale dictates that we reject the union's argument on the issue without considering its merits.

2. Because the existing agreement did not expire until April 30, 1994, the company first sought the union's consent to modify the agreement in order to implement the new schedule by January 31, 1994. Soon after the negotiations began, however, the company and the union agreed to commence negotiations for a new contract, in addition to negotiations for the company's proposal of an immediate modification of the existing contract.

3. The new proposal also contained several other changes from the existing contract, such as: forty hours pay for thirty-six hours

worked; overtime pay at time-and-a-half for hours worked in excess of thirty-six hours per week or twelve hours a day; increased pay for holiday and vacation time; and increased paid break periods.

4. By the time of the union membership's first vote in February, the company had improved its December proposal by adding a night-shift differential, an increase in the company's contribution to the monthly fringe benefit fund by fifty dollars per employee, and double pay for overtime (limited to time-and-a-half for hours in excess of thirty-six per week). In addition, the company had offered a one-time lump-sum bonus of one week's pay, to be given to the employees when the new schedule went into effect.

5. Because the existing contract was set to expire on April 30, the parties agreed to extend the original contract on a day-to-day basis, with a provision allowing for a ten-day notice to terminate.

mented by September 12, 1994. These provisions were in addition to the company's proposal that the union membership had rejected in February. *See supra* note 4. Although the union expressed the view that the June 13th proposal was "very excellent," the membership rejected it.[6] By letter of June 23rd, the company urged the union to resubmit the June 13th proposal to the membership with "the strongest possible" message that the company "*absolutely will not* make any further improvements to its proposal" and "*will not* back off its plans to convert to 12–hour scheduling." The company also alerted the union that if the June 13th offer was not ratified by the membership by July 1, 1994, the company would withdraw the proposed wage increases, increased overtime, increased vacation pay and holiday pay, as well as increased employer contributions to employee health and welfare benefits. The union sought an extension of the deadline until July 10th, but the company agreed to extend it only until July 5th, citing the costs of the delay in implementing the new schedule. The July 5th deadline passed without a new vote by the membership.

On July 11th, the company implemented the new work schedule for all non-lithograph production employees at its Chicago facility. The company begged off the union's request to resume negotiations on the basis of its busy schedule. Consequently, the parties did not meet again until the fall.

On September 14th, the company, noting its prior warning of June 23rd, proposed six changes to its June 13th proposal: withdrawal of two wage increases; calculation of overtime pay (to begin after forty hours instead of thirty-six); withdrawal of increased holiday and increased vacation pay; and a phased increase in the company's health and welfare contributions, rath-

er than an immediate fifty dollars per month increase. In addition, the company made four changes in the parties' agreement that had not been mentioned in the June 23rd letter: termination of the cost of living adjustment provision; time-and-a-half, not double, pay for hours in excess of twelve per day; reduction in the night shift differential; and deletion of the voluntary overtime provision. The union offered a counterproposal on September 22nd that called for maintaining the five-day work week in effect under the prior contract. The company rejected the counterproposal and then rejected the union's revised counterproposal to postpone implementation of the new work schedule for one year. The company also stated that same day, September 22nd, that all but four of the items in its September 14th proposal were final; it remained open to negotiations only on wages, vacation and holiday pay, and night shift differential.

A few days later, the company notified the union of its intention to terminate the contract extension agreement, *see supra* note 5, effective October 7, 1994, and the parties met for further negotiations on October 4th. At that time the company asked if the union had a new counterproposal; the union had none, inquiring only whether the company would be willing to meet with a federal mediator. The company rejected that idea and stated that its September 22nd offer was its final offer in light of the union's failure to offer a new counterproposal. The union then asked if they were at an impasse. The company's lawyer responded, "As third party observer, we are." The following day, the company notified the union by letter that the parties were "obviously and hopelessly deadlocked," and that the company would implement the new work schedule and its September 22nd proposal on October 10th, noting that "business circumstances compel" the new work schedule. Shortly after

---

**6.** There was testimony that because the vote occurred on Father's Day many employees stayed home while those who opposed the twelve-hour day attended the meeting to vote against it. The membership had, by a show of hands, approved the twelve-hour day in May.

9 a.m. on October 10th, the union advised the company that the membership had voted to accept the company's June 13th proposal. The company advised the union that that proposal had expired and been replaced by the September 22nd proposal, which the company was implementing that day.

The company met at the union's request on November 9th and took the same position in rejecting the union's renewed request to return to the June 13th proposal. Instead, the company proposed a wage increase over three years and restored its proposals for increases in vacation and holiday pay, benefit contributions, and night shift differential. The company also offered to modify the contract language regarding mandatory overtime. The union said it could not accept the new proposal without a cost of living adjustment. When the November 9th proposal was nevertheless submitted to the members for a vote, it was overwhelmingly rejected.

On November 21st, the company locked out the bargaining unit employees pending ratification of the November 9th proposal. The lockout lasted for nearly eleven months, until October 16, 1995, when the parties entered into a new collective bargaining agreement. During the lockout, the company hired at least twelve temporary replacements.

The union filed an unfair labor practice charge. An Administrative Law Judge ("ALJ") found that the company engaged in an unfair labor practice by engaging in regressive bargaining without good cause when it threatened to withdraw several provisions from the June 13th proposal and when it actually withdrew those provisions and more in the September 14th proposal. *See White Cap, Inc.*, 325 N.L.R.B. No. 220, 20, 1998 WL 430320 (July 24, 1998). The ALJ based this con-

clusion on the Board's decision in *Driftwood Convalescent Hospital*, 312 N.L.R.B. 247, 252, 1993 WL 373906 (1993), which observed that:

> the law is settled that "[t]he withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer in violation of Section 8(a)(5) of the Act where the proposal has been tentatively agreed upon. . . ."

*Id.* (quoting *Mead Corp. v. NLRB*, 697 F.2d 1013 (11th Cir.1983)) (alteration in original). The *Driftwood* opinion, which was an adoption by the Board of the ALJ's findings and recommended order,[7] explained that regressive bargaining "has the inevitable and foreseeable effect of obstructing and impeding the collective-bargaining process," *id.*, and that the relevant inquiry is " 'not whether the Respondent acted in good faith, but whether the Respondent had good cause in unilaterally withdrawing from tentative agreements and concessions made.' " *Id.* (quoting *Arrow Sash & Door Co.*, 281 N.L.R.B. 1108, 1108 n. 2, 1986 WL 54404 (1980)). In the instant case, the ALJ noted that the company's regressive bargaining was not justified by good cause because the company failed to show that economic pressure led to the company's actions. *See White Cap*, at 17–20. The ALJ also found that the company's unilateral implementation of the final offer in the absence of a legally cognizable impasse, as well as its locking out of the unit employees, constituted unfair labor practices. *See id.*

The Board reversed, and by a two to one vote, dismissed the complaint. Chairman Gould and Member Hurtgen, in separate opinions, agreed that the company satisfied its duty to bargain in good faith. Member Liebman dissented in part on the basis that the company violated the Act by refusing to bargain on mandatory subjects

---

7. Although the Board in *Driftwood* stated merely that it was "adopt[ing] the recommended Order" by the ALJ, *Driftwood*, 312 N.L.R.B. at 247, its summary affirmance of the ALJ's "rulings, findings, and conclu-

sions," *id.*, constitutes an adoption of the ALJ's findings as well. *See Cities of Bethany v. FERC*, 727 F.2d 1131, 1145 (D.C.Cir.1984); *see also City of Frankfort v. FERC*, 678 F.2d 699, 708 (7th Cir.1982).

of bargaining. We examine each opinion as background for our consideration of the union's threshold challenge to the Board's decision.

Member Hurtgen began his analysis by observing somewhat enigmatically that he found it "unnecessary to pass on the continued viability of *Driftwood* because ... the [ALJ] erred in his application of these principles to the facts of [the instant] case." *Id.* at 2. He then proceeded to apply the good cause standard and found that both the company's threats to withdraw the six provisions of the June 13th proposal and its withdrawal of those provisions and others in the September 14th proposal were supported by good cause and thus did not constitute unlawful regressive bargaining. *See id.* at 3. Specifically, he pointed to the fact that "the six tentatively agreed to items [in the June 13th proposal] had already been rejected at the time the [company] threatened to withdraw them" in the June 23rd letter. *Id.* at 2. He considered this factor, not discussed by the ALJ, to be "an important one that distinguishes this case from *Driftwood* ... where the employer withdrew from tentative agreements with the union before any ratification vote had been held." *Id.* He noted also that, unlike in the instant case, in *Driftwood* the employer had offered the union "no explanation whatsoever for withdrawing from the tentative agreements." *Id.* at 2 n. 4. In addition, he emphasized that "the record evidence establishes an intent, even a desire, by [the company] to reach agreement," *id.* at 4, and that there was "no evidence that the [company] sought to avoid reaching an agreement." *Id.* at 5. Then, turning to the other issues, he found that the company's unilateral implementation of its final offer and its lockout of the employees were lawful because they occurred following a bargaining impasse and because the lockout was "for the sole purpose of bringing economic pressure to bear in support of a legitimate bargaining position." *Id.* at 5 (citing *American Ship*

*Bldg. v. NLRB,* 380 U.S. 300, 310–11, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965)).

Chairman Gould concurred in Hurtgen's conclusion that the ALJ erred in finding that the company had violated the Act by its conduct in the bargaining negotiations. *See id.* He disagreed, however, with Member Hurtgen's discussion of the regressive bargaining doctrine. Stressing that "the default practice of collective-bargaining negotiations ... allow[s] withdrawal at will from tentative agreements prior to final agreement," *id.* at 6, Chairman Gould stated that "[t]he applicable standard here must be only whether the [company's] tactics provided full scope for good-faith bargaining." *Id.* at 7. Chairman Gould concluded, "[s]ince the evidence [in the instant case] clearly indicates that the [company] was seriously negotiating in order to obtain an agreement, we must find that it was bargaining in good faith." *Id.* To make his point about the lawfulness of regressive bargaining even clearer, Chairman Gould noted that:

> Member Hurtgen does not pass on this rule, but distinguishes [the company's] conduct on the basis that it provided a "good cause" explanation to the Union for its change of position. I would find this "rule" to be utterly inconsistent with both the Supreme Court's "freedom of contract" trilogy as well as long-held principles of collective bargaining. Inasmuch as the cases cited by the [ALJ] do support this standard, they should be overruled.

*Id.* at 6. Thus, in Chairman Gould's view, regressive bargaining is lawful, with or without good cause, as long as "it is not undertaken [with] ... an intent to evade coming to an agreement." *Id.*

Member Liebman concurred in part and dissented in part. She expressly joined Hurtgen's conclusion that the company's withdrawal of provisions of the June 13th proposal was not unlawful regressive bargaining because the company had good

cause.[8] *See id.* at 7 & n. 2. In noting her concurrence, Member Liebman emphasized that she "agree[d] with the legal principles cited by the [ALJ]," and that her "disagreement [was] solely with the way these principles were applied [by the ALJ] to the facts of this case." *Id.* at 7 n. 2. Member Liebman parted company with Member Hurtgen and Chairman Gould, however, in her conclusion that the company engaged in an unfair labor practice by refusing to negotiate over two mandatory subjects of bargaining (cost of living adjustment and voluntary overtime) in September and October 1994. *See id.* at 7. Thus, Member Liebman did not reach the issue of the validity of the company's September 14th proposal. *See id.* at 7–8.

## II.

 In order for the court properly to review the Board's decision, it "must be able to discern the rationale" underlying the Board's conclusions. *Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 90 (D.C.Cir.1995); *see also Acme Die Casting v. NLRB,* 26 F.3d 162, 166 (D.C.Cir.1994); *United Food & Commercial Workers Int'l Union v. NLRB,* 880 F.2d 1422, 1436 (D.C.Cir.1989). The union contends that the Board, by issuing three conflicting opinions, failed to articulate a rationale that the court can review, and left uncertain whether regressive bargaining in the absence of good cause violates the Act. Although the union raises a legitimate concern about the troubling division within the Board, the union overstates its position in maintaining that the three opinions "reduce [the] established principles of regressive bargaining law to chaos." Unlike the situation in *Oil, Chemical,* on which the union relies, an examination of the separate opinions shows that there is " 'a majoritysupported statement of the rule that the Board applied and will be

applying ... in the future.' " *Oil, Chemical,* 46 F.3d at 91 (quoting *United Food,* 880 F.2d at 1436–37).

In examining whether there is a Board decision that the court can review, the underlying question is the continued vitality of *Driftwood.* In that case, as noted above, the Board stated that "the law is settled that '[t]he withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer in violation of Section 8(a)(5) of the Act where the proposal has been tentatively agreed upon.' " *Driftwood,* 312 N.L.R.B. at 252 (citation omitted). The *Driftwood* Board further explained that in a regressive bargaining situation, the key issue is "whether the Respondent had good cause in unilaterally withdrawing from tentative agreements and concessions made." *Id.* (quotation omitted) (citation omitted). A review of Board precedent confirms this summary of the law. *See, e.g., Transit Serv. Corp.,* 312 N.L.R.B. 477, 483, 1993 WL 387025 (1993); *Natico, Inc.,* 302 N.L.R.B. 668, 670–71, 1991 WL 85391 (1991); *Arrow Sash,* 281 N.L.R.B. at 1108 n. 2, 1986 WL 54404; *Food Serv. Co.,* 202 N.L.R.B. 790, 803, 1973 WL 12217 (1973).

The ALJ relied on *Driftwood* in finding that the company violated § 8(a)(1) and (5) of the Act by failing to show good cause to withdraw the six provisions from the June 13th proposal. The Board, in reversing, left the good cause rule of *Driftwood* untouched. Neither Member Hurtgen nor Member Liebman adopted Chairman Gould's view that the good cause rule of *Driftwood* should be abandoned; to the contrary, they expressly relied on the *Driftwood* rule in reaching their findings. Member Hurtgen applied the good cause standard to find that the company's regressive bargaining tactics in June and September were lawful. *See White Cap,* at 2. Member Liebman joined Member

---

8. In Member Liebman's words: "For the reasons stated in ... Member Hurtgen's opinion, I join him in finding that the [company] did not bargain in bad faith in June 1994 following the employees' rejection of the contract it negotiated with the Union." *Id.* at 7 (footnotes omitted).

Hurtgen's opinion with respect to the company's conduct in June, specifically noting the good cause standard of *Driftwood* as the basis of her concurrence. *See id.* at 7 n. 2. Therefore, the *Driftwood* rule remains the law of the Board.

The difficulty to which the union points arises from the apparent indication that the good cause standard may not stand on a firm footing. In addition to Chairman Gould's criticism that the good cause requirement was contrary to the law and reality of labor practice, Member Hurtgen stated that he was avoiding the issue of "the continued viability of *Driftwood*" even though he was applying *Driftwood* in the instant case. *Id.* at 2. But the union's concern about the future viability of the *Driftwood* rule may be premature. Unlike the situation in *Oil, Chemical,* the Board in *White Cap* was not faced with a question of first impression. *See Oil, Chemical,* 46 F.3d at 84. Neither, as in *Acme Die,* or *United Food,* was the Board dealing in an area characterized by longstanding ambiguity or confusion in Board precedent. *See Acme Die,* 26 F.3d at 165–66; *United Food,* 880 F.2d at 1436. By contrast, the good cause rule had been established and repeatedly applied by the Board. *See, e.g., Transit Serv.,* 312 N.L.R.B. at 483; *Natico,* 302 N.L.R.B. at 670–71; *Arrow Sash,* 281 N.L.R.B. at 1108 n. 2; *Food Serv.,* 202 N.L.R.B. at 803. Even Chairman Gould acknowledged the existence of Board precedent requiring good cause in urging that it be overruled. *See White Cap,* at 6–7. The legal significance of the disagreement among the Board members must be evaluated in its context, and, contrary to the union's contention, the court cannot reasonably interpret the tension among the views of the Board members as upsetting Board precedent without a more express statement by the Board indicating such a change in the law. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Of course, that the majority of the Board supported the good cause rule does not fully resolve the issue whether there is a majority-supported conclusion of law that the court can review. With respect to the legality of the company's threat in June 1994 to withdraw items from the June 13th proposal unless it was ratified by July 4th, Members Hurtgen and Liebman are in agreement that no violation of the Act occurred. However, because Member Liebman never addressed whether the company's September actions constituted unlawful regressive bargaining, there is no majority decision on the issue unless Chairman Gould joined Member Hurtgen's opinion or vice versa. Chairman Gould's separate opinion makes clear that he agreed with Member Hurtgen that the company's regressive bargaining in September was not an unfair labor practice. It is also clear that Chairman Gould disapproved of Member Hurtgen's reliance on the good cause requirement of *Driftwood.* What is not as clear is the extent to which Chairman Gould and Member Hurtgen agreed or disagreed on whether the reasons for the company's regressive bargaining met the *Driftwood* good cause standard. For the following reasons, we conclude that Chairman Gould joined Member Hurtgen's opinion on the issue.

A comparison of the two Board members' opinions shows that their analyses bear more substantive resemblance to each other than might initially be evident. For his finding that there was good cause for the company's regressive bargaining in September, Member Hurtgen reasoned that the company "was seeking timely ratification and implementation of the new work schedule in exchange for improved contract terms," and that the union's refusal to approve the June 13th proposal within the stated time period thus justified the company's withdrawal of certain terms. *White Cap,* at 4. Member Hurtgen did not stop his analysis there, however. He also stated that the "essential element" of good-faith bargaining is "the serious intent to adjust differences and to reach an ac-

ceptable common ground." *Id.* at 4–5. He observed that the company satisfied this standard because "the record evidence establishes an intent, even a desire, by [the company] to reach agreement" as is clear from the company's "willingness to compromise and make concessions," *id.* at 4, and there was "no evidence that the [company] sought to avoid reaching an agreement." *Id.* at 5.

Member Hurtgen noted that Chairman Gould "concur[red] in this result," *id.* and Chairman Gould's opinion shows the extent to which his opinion should be read as concurring in the analysis, as well as in the result, of Member Hurtgen's opinion. For example, Chairman Gould, like Member Hurtgen, thought that "the evidence here clearly indicates that [the company] was seriously negotiating in order to obtain an agreement," *id.* at 7, and placed much emphasis on the company's apparent "willingness to reach agreement." *Id.* at 6. After his general discussion of the legality of regressive bargaining, Chairman Gould stressed that "[h]ere, it would be particularly inappropriate to find the [company's] withdrawals unlawfully regressive because the [company] was clearly . . . adjusting its proposals . . . in the course of bargaining in order [to] obtain agreement on a crucial issue." *Id.* at 7. From these statements, we conclude that Chairman Gould and Member Hurtgen were in agreement that the company's reasons for resorting to regressive bargaining constituted good cause. Chairman Gould's separate opinion, then, should not be read to be expressing any doubt as to whether the company met the good cause requirement. Rather, in our view, his opinion stems from his position that the good cause requirement should not be applied in future cases even though, in the instant case, the existence of the requirement did not change the ultimate outcome.

In reaching this conclusion, we emphasize that it would have been preferable for the Board to have stated more explicitly that Member Hurtgen's opinion represent-ed the majority position of the Board rather than requiring the court to decide that issue. Be that as it may, for the reasons noted, we treat Member Hurtgen's opinion as the opinion of the Board and review its findings of fact and application of the law to the facts under the familiar substantial evidence standard. *See NLRB v. United Insurance Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## III.

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). Under § 8(d), "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). The union contends that the company's withdrawal of certain terms from its proposals in June and September 1994 violated its § 8(a)(5) duty to bargain in good faith and that the Board erred in finding otherwise. Because there is substantial evidence in the record to support the Board's conclusion, we reject the union's challenge.

The Board concluded that the company had good cause for its threat to withdraw six provisions in the June 13th proposal and for its subsequent withdrawal of those six provisions plus more in September. The Board stated that, unlike in *Driftwood,* where the employer engaged in regressive bargaining before the union held a ratification vote on the tentative agreement, "the six tentatively agreed to items had already been rejected at the time the [Company] threatened to withdraw them." *White Cap,* at 2. In addition, the Board observed that the company had "stressed from the inception of negotiations its desire for timely implementation of the new

schedule" and that the "improved contract terms were linked to timely implementation of the new work schedule." *Id.* at 3. The Board concluded from these considerations that the company's threat to withdraw the June 13th proposal was "an effort to secure ratification of the agreement it reached with the Union, rather than an attempt to obstruct meaningful bargaining." *Id.* In addition, the Board relied as further support on the fact that the company offered the union another opportunity to ratify the proposal after the union's rejection and that the company had given the union sufficient "opportunity to digest, understand, evaluate, and vote on the June 13 contract proposal." *Id.* For essentially the same reasons, that the company "was seeking timely ratification and implementation of the new work schedule in exchange for improved contract terms" *id.* at 4, and that "the record evidence establishes an intent, even a desire, by [the company] to reach agreement," the Board found that the company's withdrawal of several provisions in its September proposal did not constitute an unfair labor practice. *Id.*

There is substantial evidence in the record to support the Board's findings. During the parties' extended negotiations for nearly a year, the company made repeated efforts to reach common ground with the union. The company made clear from the beginning of the negotiations that it could not offer a wage increase and that it sought a timely implementation of the new work schedule. However, the company was willing to offer a shift differential, increased contributions to the monthly fringe benefit fund, and increased overtime pay, all in response to specific demands by the union as a condition for approving the new work schedule. When those concessions proved to be inadequate, the company gave up its initial position and agreed to give wage increases, in a proposal that the union characterized as "very excellent." Even after the membership rejected the proposal on June 19th, the company gave the union a second chance and ex-

pressed its hope that they reach an agreement soon. In addition, throughout the period, the company stressed that the improved contract terms it was offering were linked to timely implementation of the schedule, and this link was emphasized in its June 23rd letter. The union membership's failure to ratify timely the proposal triggered the company's withdrawals, and these circumstances hardly demonstrate that the company sought to frustrate the collective bargaining process. Therefore, the Board's finding of good cause in the company's regressive bargaining is supported by substantial evidence.

■ Contending that the Board erred in its application of the good cause standard, the union asserts that Board precedent recognizes only two types of good cause to justify regressive bargaining—changed economic circumstances and a change in the party's relative bargaining power. This misrepresents the law. The cases cited by the union support its position only to the extent that each case can easily be placed in one of the two categories that the union puts forward. *See, e.g., A.M.F. Bowling Co.,* 314 N.L.R.B. 969, 975, 1994 WL 478490 (1994), *enf. denied on other grounds,* 63 F.3d 1293 (4th Cir.1995); *Aero Alloys,* 289 N.L.R.B. 497, 497 (1988); *Cook Bros. Enters.,* 288 N.L.R.B. 387, 387–89, 1988 WL 213645 (1988); *O'Malley Lumber Co.,* 234 N.L.R.B. 1171, 1179–80, 1978 WL 7327 (1978). However, no case cited by the union has limited the definition of good cause to the two categories only. Of the cases cited by the union, the closest the Board came to the union's position was in the following passage in *Hyatt Hotels Corp.,* 296 N.L.R.B. 289, 314, 1989 WL 224328 (1989):

A regression in economic position during bargaining is not of itself dispositive of the good-faith issue where economic considerations and the ability to compete motivate the regressive bargaining stance. Furthermore, it is no manifestation of bad faith for an employer to

change his bargaining posture to one less favorable when he does so in "flexing economic muscle" in consequence of an intervening circumstance. . . .

*Id.* at 314 (citation omitted). However, nowhere did the Board state in *Hyatt Hotels* that these categories exhausted the possible types of good cause. On the contrary, the Board also defined the general issue of justifiable regressive bargaining as whether a party's "proffered reasons for its changed bargaining stance were so illogical or unreasonable as to necessarily warrant an inference of bad faith." *Id.* at 315. In *Barry-Wehmiller Co.,* 271 N.L.R.B. 471, 473 (1984), another case cited by the union, the Board stated that, in evaluating the legality of an instance of regressive bargaining, "[w]hat is important is whether [the proffered reasons for regressive bargaining] are 'so illogical' as to warrant the conclusion that the [party] by offering them *demonstrated an intent to frustrate the bargaining process and there-by preclude the reaching of any agreement." Id.* (emphasis added).

This view, that the key issue in evaluating the propriety of regressive bargaining is whether it is designed to "frustrate the bargaining process," is the principle applied by the Board in the instant case, and is the predominant theme in the Board's regressive bargaining decisions. In addition to the cases already discussed, the following cases, all cited by the union, are illustrative: *Fairhaven Properties, Inc.,* 314 N.L.R.B. 763, 771, 1994 WL 446846 (1994); *Transit Serv.,* 312 N.L.R.B. at 483; *Toyota of San Francisco,* 280 N.L.R.B. 784, 801, 1986 WL 54048 (1986); *Pacific Grinding Wheel Co.,* 220 N.L.R.B. 1389, 1390, 1975 WL 6114 (1975). Therefore, the Board here has not departed from Board precedent. On the other hand, to generalize, as the union does, that Board precedent requires changes in either a party's economic circumstances or bargaining power for good cause to exist is to make an illogical leap from "If $x$ is the case, regressive bargaining is justified" to

"If $x$ is not the case, regressive bargaining is not justified." The root of this elementary error on the union's part is its perception that the good cause requirement is a narrow exception to the general rule that regressive bargaining constitutes bad faith bargaining, a view that has no basis in Board precedent.

The union also cites several Supreme Court and circuit courts of appeals cases to contend that the Board's opinion frustrates the purpose of § 8(a)(5) of the Act. This contention has no merit. In order to make *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), applicable to the instant case, the union resorts to quoting general statements prohibiting "behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion," *Katz,* 369 U.S. at 747, 82 S.Ct. 1107, without explaining how such statements demonstrate that the Board reached the wrong decision in the instant case. Neither is *Daily News of Los Angeles v. NLRB,* 73 F.3d 406 (D.C.Cir.1996), another case relied on by the union, of much help in that it was also about what the court saw as " 'behavior which is in effect a refusal to negotiate.' " *Id.* at 414 (quoting *Katz,* 369 U.S. at 747, 82 S.Ct. 1107). In the instant case, the starting point of the Board's analysis was precisely that "the withdrawal of previous proposals does not per se establish the absence of good faith," *White Cap,* at 4, and thus does not constitute "behavior which is in effect a refusal to negotiate." *Katz,* 369 U.S. at 747, 82 S.Ct. 1107. Therefore, the union's reliance on *Katz* and *Daily News* is misplaced.

Similarly, the union's contention based on *Charles D. Bonanno Linen Serv., Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), and *McClatchy Newspapers, Inc. v. NLRB,* 131 F.3d 1026 (D.C.Cir.1997), has no merit. The union cites the two cases for the proposition that certain bargaining tactics are so destabilizing that they are improper even if there is no showing of subjective bad faith. The

cases may well stand for that proposition; however, the union's further inference that the Board therefore erred in not finding a violation of the Act is a nonsequitur. Again, the Board started from the assumption, firmly supported by Board precedent, that regressive bargaining is not so harmful to the collective bargaining process as to require a general prohibition. Therefore, the Board's findings simply do not contradict the propositions of law that the union contends are dispositive. In the end, the union offers no reason for the court to disturb the Board's conclusions.

## IV.

 The union further contends that the company violated § 8(a)(5) of the Act by unilaterally changing terms and conditions of employment in October, 1994 without a bargaining impasse. *See NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1165 (D.C.Cir.1992) (in banc); *American Fed'n of Television & Radio Artists, Kansas City Local v. NLRB*, 395 F.2d 622, 624 (D.C.Cir.1968). We have previously stated that "[t]here is no fixed definition of an impasse ... which can be applied mechanically to all factual situations." *Dallas Gen. Drivers, Warehousemen and Helpers, Local No. 745 v. NLRB*, 355 F.2d 842, 845 (D.C.Cir.1966). The Board "considers a number of factors, including the 'bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations.'" *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1083 (D.C.Cir. 1991) (quoting *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), *aff'd*, 395 F.2d 622 (1968)) (alteration in original). We hold that there is substantial evidence in the record supporting the Board's application of these factors in finding an impasse. *See White Cap*, at 5.

First, at the time of the unilateral implementation, the company had bargained in good faith with the union for approximately ten months, making many concessions along the way. In addition, as the Board observed, "the parties on October 4 were at impasse on the critical issue of the [new work] schedule, which precluded reaching an agreement." *Id.* The new work schedule was a critical issue for the company, as it had made clear at the beginning of the negotiations. After rejecting the company's proposals containing the new schedule several times, the union proposed maintaining the old work schedule in its September 22nd proposal. When the company rejected the union's attempt to revive the old work schedule, the union proposed that implementation of the new work schedule be postponed for one year, which the company also rejected. In their last meeting before October 10th, the union failed to offer any new proposal. The contemporaneous understandings of the parties further support the Board's finding. On October 4th, the Union offered no new proposal and brought up the subject of whether there was an impasse, and did not disagree when the company's attorney stated that he believed the parties were at an impasse. The union's contention that the impasse was broken when it ratified the June 13th offer before the unilateral implementation is meritless, considering how the June 13th offer had expired months earlier. Thus, applying the relevant factors shows that there was substantial evidence for the Board's finding that there was an actual impasse before the company's unilateral implementation of its final offer on October 10th.

 Finally, the union maintains that even if there were an impasse, it did not justify the company's unilateral implementation because the impasse was caused by the company's unlawful regressive bargaining. *See United Packinghouse, Food & Allied Workers Int'l Union v. NLRB*, 416 F.2d 1126, 1131 (D.C.Cir.1969). We reject this contention because, as noted, the Board reasonably concluded that the company's regressive bargaining did not

constitute an unlawful labor practice. Similarly, the union contends that the company's lockout was unlawful because the company's unlawful labor practice deprived it of the claim that the purpose of lockout was to "bring[ ] economic pressure to bear in support of [its] legitimate bargaining position." *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *see also Teamsters Local Union No. 639 v. NLRB,* 924 F.2d 1078, 1085 (D.C.Cir.1991). Again, as the Board found, the company did not engage in an unfair bargaining practice, and there is substantial evidence in the record to support the Board's decision that the lockout was lawful because the company's purpose was to apply economic pressure on the employees in order to support its "legitimate bargaining position." *American Ship Bldg.,* 380 U.S. at 318, 85 S.Ct. 955.

Accordingly, we deny the petition.